[Crim. No. 2692. In Bank.—January 24, 1925.]

# THE PEOPLE, Respondent, v. D. E. COLLINS, Appellant.

[1] CONTINUANCE—DISCRETION—APPEAL.—It is a settled rule of practice that an application for a continuance is addressed to the sound discretion of the trial court, and that its ruling will not be reviewed except for the most cogent reasons. The trial court is apprised of all the circumstances of the case, and the previous proceedings, and is, therefore, better able to decide upon the propriety of granting the application than an appellate court; and when it exercises a reasonable and not an arbitrary discretion, its ruling will not be disturbed.

[2] ID.—ABSENCE OF WITNESS—DILIGENCE.—The absence of a witness is no cause for a continuance unless due diligence has been used by the party to procure his attendance at the trial, and due diligence imports that proper legal means must have been resorted to for the purpose of compelling the attendance of the witness, and even if a subpoena is issued to compel attendance, still it must appear that due diligence has been used in seeing that such process is served within a reasonable time.

[3] ID.—MOTION FOR CONTINUANCE—AFFIDAVITS—LOCATION OF WITNESS—ABILITY TO SECURE TESTIMONY.—On a motion for a continuance, if the supporting affidavits do not show where the desired witness is and that his testimony can be obtained within a reasonable time, it is not an abuse of discretion in the court to refuse to grant a continuance.

[4] ID.—FACTS EXPECTED TO BE PROVED.—In order to obtain a continuance, the affidavit should state that the facts expected to be proved by the absent material witness cannot be otherwise proved, and it is not, therefore, prejudicially erroneous to refuse a continuance on account of the absence of a witness, if the substance of the testimony expected to be elicited from him has been given by another witness.

[5] CRIMINAL LAW—MANSLAUGHTER—VERDICT—CONSTRUCTION OF.—In a prosecution for manslaughter where the first paragraph of the verdict finds the defendant guilty as charged in the information, it is a general verdict and does not depend for its efficacy upon a second paragraph containing a statement as to what the verdict is based on and a recommendation for leniency; and such a

---

1. See 6 R. C. L. 544; 5 Cal. Jur. 968.
2. See 6 R. C. L. 560; 5 Cal. Jur. 993.
3. See 5 Cal. Jur. 1000.
5. See 27 R. C. L. 858; 8 Cal. Jur. 400.

verdict is not an imperfect special verdict upon which the court should pronounce a judgment of acquittal.

[6] Id.—Finding of Jury—Special Verdict.—If the finding of the jury in such a case be consistent with a verdict of guilty, it does not constitute a special verdict as that term is used in the statute.

[7] Id. — Recommendation of Mercy. — If a verdict contains words recommending mercy or leniency it is well settled that they constitute no part of the verdict and may be rejected as surplusage.

[8] Id.—Driving Automobile While Intoxicated—Manslaughter—Section 367e, Penal Code.—There is no ground for holding that the legal effect of the adoption of section 367e of the Penal Code was to eliminate from the definition of manslaughter the killing of another by a person driving an automobile while in an intoxicated condition, making such an act a separate and distinct felony, and rendering the prosecution of such person under the manslaughter section of the Penal Code, section 192, improper.

[9] Id. — Sufficiency of Evidence. — In this prosecution for manslaughter it is held that the evidence was sufficient to establish that the defendant was in a state of voluntary intoxication at the time of the accident and that he was driving a car on the wrong side of the highway when approaching another vehicle, and that one or both of these facts was the proximate cause of the death of the deceased.

[10] Id.—Character of Crime—Felony.—In cases where either felonious or misdemeanor punishment may be imposed for the same criminal act, the charge may be prosecuted as a felony.

[11] Id.—Grades of Crime—Punishment.—Any offense which may be or is liable to be punished by death or imprisonment in the state's prison is a felony, and any offense which is not liable to such punishment—that is, for which that grade of punishment cannot under any circumstances be inflicted—is a misdemeanor.

[12] Id.—Involuntary Manslaughter—Definition.—To constitute involuntary manslaughter death may be due either to the commission of an unlawful act, not amounting to a felony, or to the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection.

[13] Id.—Violation of Section 367e, Penal Code—Manslaughter.—Violation of section 367e of the Penal Code may be prosecuted

---

8. Liability of one operating automobile while intoxicated, note, L. R. A. 1917A, 313.

Homicide by negligent operation of automobile while intoxicated, note, L. R. A. 1918B, 957. See, also, 13 Cal. Jur. 615; 13 R. C. L. 784.

11. See 8 R. C. L. 55; 7 Cal. Jur. 870.

either as a distinct crime of felony or be made the basis of a prosecution for manslaughter, and in such a prosecution where the evidence supports a finding that defendant was driving on the wrong side of the highway and that he was in a state of voluntary intoxication, either of said acts supports a verdict of conviction.

[14] ID.—INTOXICATION—EVIDENCE OF CONDITION—TIME.—In such a case the intoxication of the defendant being an issue in the case, it was proper to prove that he was intoxicated at the time, and evidence of his condition both before and after the accident was relevant if it tended to show his condition when the deceased was struck, even though it might tend to prejudice the defendant in the minds of the jurors by inducing the belief that he had been the perpetrator of another crime, if the period of time be such that the condition be reasonably supposed to have been continuous.

[15] ID.—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE OF DECEASED.— In such a case there was no error in giving an instruction apparently intended to convey the idea that if the defendant violated the law, the contributory negligence of the deceased, if any, would not excuse the crime, where there was no evidence that the deceased did not use ordinary care, and his dying declaration would indicate that he was entirely free from blame.

[16] ID.—FAILURE TO DEFINE TERMS.—In such a case there was no error in failing to define the technical words "negligence," "measure of care," or "proximate cause" as used in said instruction, where the defendant did not propose or request that said definitions be given.

[17] ID. — ALLEGED MISCONDUCT OF DISTRICT ATTORNEY — FAILURE TO PRESENT RECORD. — Where no attempt is made to present a record on appeal covering alleged misconduct of the district attorney in the trial, the point cannot be passed upon on appeal.

---

(1) 16 C. J., p. 451, sec. 821; 17 C. J., p. 233, sec. 3578.    (2) 16 C. J., p. 489, sec. 892, p. 491, sec. 894, p. 496, sec. 907.    (3) 16 C. J., p. 504, sec. 919, p. 505, sec. 925.    (4) 16 C. J., p. 504, sec. 924.    (5) 16 C. J., p. 1102, sec. 2586.    (6) 16 C. J., p. 1102, sec. 2586.    (7) 16 C. J., pp. 1110, 1111, sec. 2601.    (8) 29 C. J., p. 1152, sec. 138.    (9) 30 C. J., p. 287, sec. 531, p. 317, sec. 561.    (10) 16 C. J., p. 59, sec. 10. (11) 16 C. J., p. 56, sec. 6, p. 57, sec. 7.    (12) 29 C. J., p. 1148, sec. 134.    (13) 29 C. J., p. 1149, sec. 136.    (14) 30 C. J., p. 223, sec. 454. (15) 17 C. J., p. 342, sec. 3690.    (16) 17 C. J., p. 66, sec. 3333. (17) 17 C. J., p. 170, sec. 3462.

14.   See 8 R. C. L. 188; 8 Cal. Jur. 50.
16.   See 8 Cal. Jur. 327.

APPEAL from a judgment of the Superior Court of Tulare County and from an order denying a new trial. J. A. Allen, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. M. Conley, Philip Conley and Lindsay & Conley for Appellant.

U. S. Webb, Attorney-General, Erwin W. Widney, Deputy Attorney-General, Fred C. Scott, District Attorney, and Leroy McCormick, Deputy District Attorney, for Respondent.

LAWLOR, J.—At 10:30 P. M. on February 26, 1923, on the state highway about seven miles in a northwesterly direction from Tulare, the defendant, D. E. Collins, driving an automobile, ran into and collided with a motorcycle being operated by Lewis Hawks, which collision resulted in the death of the said Lewis Hawks.

The defendant was charged by the district attorney of Tulare County with the crime of felony, to wit: Manslaughter. Upon arraignment the defendant pleaded not guilty and on the trial the verdict of the jury was rendered in these words:

"We, the jury, find the defendant guilty as charged in the information.

"JOHN G. ANDERSON, Foreman.

"As this verdict is based on the unlawful operation of a motor vehicle, towit: Driving on the wrong side of the Highway, when approaching another Motor Vehicle, we the jury recommend leniency.

"JOHN G. ANDERSON, Foreman."

Following the trial counsel for the defendant interposed a motion "for an order entering a judgment of dismissal of defendant and cited section 1155 of the Penal Code in support of said motion"; which motion was subsequently denied. A motion for a new trial on the grounds specified in section 1181 of the Penal Code was interposed and denied. "Thereupon counsel for the defendant gave notice of his intention to appeal from the order of court denying the

motion for new trial." A motion to admit the defendant
to probation was then made and denied, whereupon testimony
was taken under section 1192a of the Penal Code. The de-
fendant was then sentenced to the penitentiary. "There-
upon counsel for defendant gave notice of his intention to
appeal."

Several points are urged as grounds for the reversal of
the judgment of conviction and the order denying appel-
lant's motion for a new trial.

### I.

Appellant's first point is that "Defendant was denied his
constitutional right to a fair trial by the action of the court
in refusing to grant a continuance upon timely application
to permit him to produce the testimony of Reverend Stephen
O'Keefe, which testimony would have clearly established de-
fendant's sobriety on the evening of the accident, and hence
defendant's innocence of the charge." In this connection
appellant contends that due diligence was shown to serve the
witness with process and that the failure to allow the con-
tinuance "amounted to a *gross abuse* of discretion," citing
*People* v. *Plyler*, 121 Cal. 160 [53 Pac. 553]; *People* v. *Diaz*,
6 Cal. 248; *People* v. *McCrory*, 41 Cal. 458; *People* v. *Lee*,
2 Cal. Unrep. 569 [8 Pac. 685]; *Graham* v. *State*, 50 Ark.
161, 167 [6 S. W. 721]; *Newton* v. *State*, 21 Fla. 53, 70;
*People* v. *Waliach*, 62 Cal. App. 385 [217 Pac. 81].

The appellant was arraigned and pleaded not guilty on
March 26, 1923, whereupon the court set the trial for
Tuesday, June 12, 1923. On June 1, 1923, counsel for
appellant moved for an order continuing the trial on the
ground that Father O'Keefe, a material and necessary
witness for appellant, had left the jurisdiction of the
court. C. L. Bradley, one of the attorneys for appel-
lant, filed a supporting affidavit which averred that Father
O'Keefe is a material and necessary witness; that his pres-
ence cannot be secured nor his evidence obtained before June
12, 1923; that if the trial is postponed the presence of said
witness can be secured or his testimony obtained; that this
witness will testify that appellant was not under the influ-
ence of intoxicating liquor; that he was with appellant
throughout the day of the accident and that when he left
Tulare appellant was in possession of his normal faculties;

that due diligence to secure the attendance of this witness was used; that the subpoena was caused to be issued on May 12, 1923, and on that day placed in the hands of the sheriff of the county of Tulare, with instructions and the witness' address; that the sheriff informed the affiant that the witness had left the state of California and is now in Ireland visiting his parents; that he took his departure before service could be had upon him; and that affiant is informed and believes that this witness will be without the jurisdiction of the court for a period of about two or three months.

Following argument on the motion to continue the trial the motion was denied. Again on June 12, 1923, the day set for the trial, counsel for appellant made another motion for continuance and filed four supporting affidavits; the court also heard the testimony of John Hazen, a deputy sheriff of the county of Tulare. The affidavit of the appellant was similar to the affidavit of C. L. Bradley and further averred that for a period of eight days subsequent to May 12, 1923, the date of the issuance of the subpoena, Father O'Keefe was within the jurisdiction of the court; that said witness will testify that he was in the company of appellant from 5 P. M. on February 25th to 10 P. M. on February 26th, the day of the accident; that appellant was sober all of this time; that appellant is unable to procure any other witness who will testify to these facts; that it is "extremely uncertain when the Rev. Stephen O'Keefe will return to the State of California," but that he is at the present time residing at Trieneragh, County of Kerry, Ireland; that an application for an order to take his deposition accompanies the affidavit, and that appellant had no reason to believe that the said witness would depart from the state of California.

The affidavit of W. M. Conley, one of the attorneys for appellant, averred the above facts and stated further that on May 12, 1923, he was informed that there was a likelihood of said witness departing from the state of California; that a subpoena was caused to be issued immediately; that it was placed in the hands of the sheriff for service; that said witness was within the jurisdiction of the court on May 20, 1923; that said witness is a pastor of the Roman Catholic church at Tulare, and is under the jurisdiction of the bishop of Los Angeles, and the affiant had no reason to believe that

he contemplated leaving prior to the trial; and that due
diligence has been exercised whenever a subpoena is taken
out and placed in the hands of the sheriff for service at a
period of thirty days preceding the trial.  On June 12, 1923,
the affidavit of C. L. Bradley was again placed before the
court and another of the appellant in which he asked that
a commission be issued directed to some person in Ireland
to examine the witness upon prepared interrogatories.

. John Hazen, the deputy sheriff of the county of Tulare,
testified that the subpoena was placed in his hands on May
12, 1923, with the information that the witness was the pas-
tor of the Catholic church at Tulare; that he went to the
parsonage the next day and asked for Father O'Keefe; that
the lady who answered the doorbell said he was not there;
that she did not know "for certain" when he would be back;
that she thought he was in the south part of the state and
would probably be back about Thursday or Friday of the
next week; that he went again the following Friday morn-
ing, May 18, 1923, and another priest came to the door;
that he asked him where Father O'Keefe was and "he said
he thought he was with his people. 'Well,' he says, 'I don't
think you can get any service on him.' I says, 'He is not
in this county, to-day, then?' 'No,' he says, 'he is not in
this county' "; that he reported the result to the attorneys
for the appellant; that the next week he gave the subpoena
to a Mr. Smith to serve; that three days later he returned
and was informed the witness was not in this state; and that
he informed the attorneys for appellant about June 1, 1923,
that he could not obtain service on the witness.

After argument the appellant's motion was denied by the
court on the ground that due diligence had not been shown
in the attempt to serve the witness.

The appellant contends that "Notwithstanding this show-
ing of necessity . . . the trial court forced the defendant to
go to trial immediately when the very basis of the charge
of the People was that the defendant was drunk at the time
of the accident.  This denial of the right to testimony which
would have established his innocence was fatal to the de-
fendant, and the conviction which followed can be attributed
solely to the fact that defendant was not accorded a fair
chance to prove by the said witness that he was sober

throughout the day of the accident and at the time of the collision.''

It does not appear to us that the trial court abused its discretion in refusing to grant a continuance. The record shows that appellant had from March 26, 1923, the day he was arraigned and the case set for trial, until June 12, 1923, the date of the trial, in which to secure his witnesses. It does appear that until May 12, 1923, he was not aware the desired witness would not be available, when his attorney was informed that he was about to leave. From May 12, 1923, until June 12, 1923, was sufficient time in which to secure service, and although it does appear that such witness left about May 20, 1923, still he had eight days within which to secure service. Deputy Sheriff Hazen had not, evidently, been informed of the priest's contemplated departure because he made no special effort to obtain service and made only two trips to the parsonage before May 20, 1923. The facts of *People* v. *Plyler,* 121 Cal. 160 [53 Pac. 553], relied upon by appellant, are distinguishable from those at bar. In that case, in granting a new trial, the court held it was error to refuse an order for a continuance based on the ground of the illness of the defendant's wife whose testimony would tend to entirely exonerate him and that ''she was the only person by whom he could prove any of these facts.'' The wife in that instance was under subpoena but was taken ill two or three days before the trial and according to the certificates of two physicians who examined the witness, her attendance in court would be dangerous to her life. It was stated in the affidavit of the defendant that in a month she would have recovered her health and be able to appear and testify. This court, citing *People* v. *McCrory, supra, People* v. *Dodge,* 28 Cal. 445, and *People* v. *Brown,* 46 Cal. 103, held that the delay was not unreasonable. The other cases cited by appellant are not in point here.

[1] ''It is a settled rule of practice that an application for a continuance is addressed to the sound discretion of the trial court, and its ruling will not be reviewed except for the most cogent reasons. The trial court is apprised of all the circumstances of the case and the previous proceedings, and is, therefore, better able to decide upon the propriety of granting the application than an appellate court; and when

it exercises a reasonable, and not an arbitrary discretion, its action will not be disturbed.'' (5 Cal. Jur. 968.) **[2]** The absence of a witness is no cause for a continuance unless due diligence has been used by the party to procure his attendance at the trial, and due diligence imports that proper legal means must have been resorted to for the purpose of compelling the attendance of the witness. And even if a subpoena is issued to compel attendance, still it must appear that due diligence has been used in seeing that such process is served. (*Jacks* v. *Buell,* 47 Cal. 162; *People* v. *Quincy,* 8 Cal. 89; *Frank* v. *Brady,* 8 Cal. 47; *People* v. *Sliger,* 17 Cal. App. 464 [120 Pac. 40] ; *Hawley* v. *Los Angeles Creamery Co.,* 16 Cal. App. 50 [116 Pac. 84].) And, furthermore, although a subpoena has issued, if no effort to secure the testimony has been made within a reasonable time there is not a sufficient showing of diligence. (*Tompkins* v. *Montgomery,* 123 Cal. 219.) **[3]** And if the supporting affidavits do not show where the desired witness is and that his testimony can be obtained within a reasonable time it is not an abuse of discretion in the court to refuse to grant a continuance. (*Harper* v. *Lamping,* 33 Cal. 641; *Watson* v. *Columbia Basin Development Co.,* 22 Cal. App. 556 [135 Pac. 511].) Under the above authorities it is proper to hold that the appellant did not use due diligence in obtaining service of the subpoena knowing at least from May 12, 1923, that the desired witness was contemplating departure from the state. It is averred in one affidavit that he will be absent two or three months and in another that ''it is extremely uncertain when he will return.'' Upon this showing the court could have found that the desired witness would not return within a reasonable time, or that the length of his absence could not be estimated.

**[4]** In the second place, in order to obtain a continuance, the affidavit should state that the facts expected to be proved by the absent material witness cannot be otherwise proved. It is, therefore, ''not prejudicially erroneous to refuse a continuance on account of the absence of a witness, if the substance of the testimony expected to be elicited from him has been given by another witness.'' (5 Cal. Jur. 993.)

The fact sought to be proved by Father O'Keefe was that from 5 o'clock P. M. on February 25th to 10 P. M. on Feb-

ruary 26th, the appellant was sober and was not under the influence of intoxicating liquor. Three other witnesses testified as to the sobriety of appellant during the greater part of this time.

The appellant testifying in his own behalf stated that between the hours of 8 o'clock on the evening of February 26th and 1 o'clock on the afternoon of February 27th he was not at any time under the influence of intoxicating liquor, and further, that he had never seen the bottle which was picked up by the side of the road at the scene of the second accident and introduced into evidence as exhibit 5 before it was shown to him in the courtroom at the trial.

Mrs. Kathleen Carroll, the housekeeper for Father O'Keefe at the parish house in Tulare, testified that on the evening of February 26th the appellant was at the parish house for dinner; that no liquor was served that she saw; that after the dinner was served she went into the kitchen; that she did not see the appellant drink anything while he was at the parish house and that he did not appear to be under the influence of liquor; that before the appellant left he went into the kitchen and bid her good-bye and she did not notice anything peculiar in his actions; and that he was sober when he came at 6 o'clock and when he left.

Mrs. Elizabeth McNamara, who lived at a Mr. Spaulding's home in Visalia, testified that she first met the appellant in San Francisco; that she saw him on the evening of February 26th; that about half-past 8 he came out to see her on insurance business; that they went to the parish house in Tulare and arrived about half-past 9; that they remained about an hour and she was in the company of the appellant the whole time; that he was not under the influence of intoxicating liquor and did not appear to be; that he was sober all the time; that she sat by him all the evening and if he had been drinking she could have detected liquor on his breath; that he left her at 10:30; that the appellant was driving his own car and that it operated "perfectly all right" while she was driving with him.

It is clear, therefore, that the testimony of the desired witness would be merely cumulative and that the court did not, under the circumstances shown, abuse its discretion in refusing to grant the continuance.

## II.

[5]  Appellant's second point is that the verdict of the jury does not support the judgment, for the reason that the verdict was an imperfect special verdict and is "insufficient in form to warrant a judgment of conviction thereon, since all of the ultimate facts upon which guilt could be predicated are not found by the jury."

Section 1152 of the Penal Code is as follows: "A special verdict is that by which the jury find the facts only, leaving the judgment to the court. It must present the conclusions of fact as established by the evidence, and not the evidence to prove them, and these conclusions of fact must be so presented as that nothing remains to the court but to draw conclusions of law upon them." Section 1153 provides how special verdicts shall be rendered, section 1154 provides that they need not be in any particular form, section 1155 provides in part: "The court must give judgment upon the special verdict as follows: 1. If the plea is not guilty, and the facts prove the defendant guilty of the offense charged in the indictment, or of any other offense of which he could be convicted under that indictment, judgment must be given accordingly. But if otherwise, judgment of acquittal must be given." Section 1156 provides that when special verdicts are defective a new trial shall be ordered, and section 1161 provides that if the jury render a verdict which is neither general nor special, the court may direct them to reconsider it and it cannot be recorded until it is rendered in some form from which it can be clearly understood that the intent of the jury is to render either a general or a special verdict.

The first paragraph of what is asserted to be a special verdict is unquestionably a general verdict finding the appellant guilty as charged in the information and does not depend for its efficacy as such upon the second paragraph. It is not an imperfect special verdict upon which the court should have pronounced a judgment of acquittal. [6]  If the finding of the jury be consistent with a verdict of guilty or of not guilty, it does not constitute a special verdict as that term is used in the statute. The verdict herein was unequivocal in meaning, for it found the appellant guilty as charged in the information. Plainly, the second paragraph is merely a recommendation for leniency and appar-

ently is based on the circumstance that the appellant was driving on the wrong side of the highway when approaching another car coming in the opposite direction. Evidently in the minds of the jury this mitigated the offense. It cannot be regarded as a special finding in any way qualifying the complete general verdict which preceded it. In *State* v. *Schweitzer,* 18 Idaho, 609 [111 Pac. 130], the verdict was "guilty of selling by short weights as charged in the complaint." The court held the words "of selling by short weights" are to be treated as surplusage and the verdict was upheld. **[7]** If a verdict contains words recommending mercy or leniency it is well settled that they constitute no part of the verdict and may be rejected as surplusage. (8 Cal. Jur. 407.) In *People* v. *Mitchell,* 61 Cal. App. 569 [215 Pac. 117], it is said: "Counsel for defendant also objects to the form of the verdict which was rendered by the jury. It was as follows: 'We, the jury impaneled to try the above entitled cause, find the defendant guilty as charged in the information, and recommend to the court that his sentence be not over five years.' Section 1151 of the Penal Code provides that a general verdict upon a plea of not guilty is either 'guilty' or 'not guilty.' The effect of defendant's contention is that the recommendation of the jury annexed to the verdict, that the sentence be not over five years, is not mere surplusage, but is a condition which renders the verdict nugatory. In the case of *People* v. *Holmes,* 118 Cal. 444 [50 Pac. 675], it appears that a verdict was returned which, among other irregularities, prayed 'the extreme mercy of the court in its sentence and punishment.' The verdict was upheld on the ground that it should have a reasonable construction and be given effect according to its manifest intention. And see *People* v. *Cornell,* 29 Cal. App. 430 [155 Pac. 1026], in which the California authorities bearing upon the subject are reviewed. In *People* v. *Bowman,* 24 Cal. App. 781 [142 Pac. 495], where one of the verdicts returned by the jury was, 'We the jury find the defendant guilty of the crime charged and leave to the mercy of the court,' it was held that such a verdict was not rendered invalid by reason of the concluding clause. The only matter to be considered here is the effect which the verdict, if any, produced by the recommendation as to the sentence to be

imposed on defendant. A verdict is to be construed like any other instrument, and the rule is that, taking the verdict in its entirety, if the meaning intended to be conveyed may be clearly ascertained by common understanding, the verdict is sufficient, notwithstanding any surplusage or that there may be included therein irregularities in spelling or awkward or incorrect expressions from a grammatical standpoint. From the language used in the verdict in the instant case there is no difficulty in ascertaining the fact that the jury found the defendant guilty as charged in the information.''

The language in the first paragraph that appellant is guilty of the crime of manslaughter as charged in the information is complete and unequivocal and the intention of the jury to convict the appellant of the offense charged is unmistakably expressed.

### III.

[8] Appellant's asserted third ground for reversal is that ''Since the legislature had prior to said alleged crime specifically eliminated from the definition of manslaughter, the killing of another by a person driving an automobile while in an intoxicated condition, and denounced the act of killing by a person while driving an automobile in an intoxicated condition as a separate and distinct felony (sec. 367e, Pen. Code), the whole prosecution of the defendant under the manslaughter section of the Penal Code, section 192, was improper, the evidence of intoxication adduced was improperly and erroneously admitted, and the court should have instructed the jury to acquit the defendant.''

The information charging the crime of manslaughter does not allege that the killing was due to the intoxication of appellant or to any act done by reason of such intoxication. Nor is it alleged that driving on the wrong side of the road was the cause of the accident. Manslaughter is charged in the conventional form without any specification of the act which caused death. It is simply alleged that appellant ''did willfully, unlawfully and feloniously kill one Lewis Hawks.'' No reference is made to section 367e and it is not otherwise attempted to set forth the means by which the death of the deceased was accomplished. The record does not show that the information was demurred to or that a motion in arrest of judgment was made. It is shown that when judgment

195 Cal.—22

was about to be pronounced a motion to dismiss was made on the ground the verdict was not sufficient within the meaning of section 1155 of the Penal Code. As already indicated, this motion was denied.

Before passing on the contention of appellant we will describe the evidence in the case. The evidence covers the accident on the highway in which the deceased was struck by appellant's Hudson coach and a collision between appellant's car and a truck and trailer belonging to A. E. Fiske, which occurred about an hour later on the highway about two miles north of Goshen. The following testimony relates principally to the claim that the appellant was intoxicated on the occasion in question:

George Scheidt testified that he met appellant at Tulare "just before the accident," on February 26th, on the sidewalk in front of the R & R cigar-store; that A. L. Berry and a chap named Moss were present and that appellant "asked me the road to Fresno and he asked A. L. Berry the road to Fresno—and that is the first time he had been over the road, and he told me to tell Collins the road, because I had been over it before—so I told him the way to go, and he said he wanted to know the right road because he wanted to get to Fresno. Q. And did you note anything, particularly, in respect to his condition at that time, Mr. Scheidt? A. Well, yes, to a certain extent; he wasn't standing up right, teetered a little bit, and I smelled liquor on his breath." On cross-examination it was sought to impeach this witness' testimony by showing that at the coroner's inquest he did not testify that appellant "teetered." The witness explained that at the coroner's inquest he was nervous and could not remember everything because it was the first time he was on the witness-stand. He further testified that he and his companions went into the cigar-store for about three minutes and that when they came out appellant had gone; that after the accident in which the deceased was injured he and his companions assisted appellant in getting his car out of the embankment and that when they then proceeded to Fresno Moss rode with appellant, who went first, then the witness, driving his own car, and after him A. L. Berry in his car; that appellant pursued "an erratic course, from one side of the road to the other"; that about two miles north of Goshen

the car of appellant collided with a Dodge commercial truck which was proceeding south on the west side of the road; that just before the collision appellant was off the highway on his right side and turned upon the highway and into the truck; that after the collision appellant's car went into the fence on the west side of the highway; that a bottle was found on the left side of appellant's car after it had stopped in the fence; that the speed maintained between Tulare and the scene of the accident was twenty-five miles an hour; and that after the first accident the left fender and left head-light on appellant's car were smashed.

A. L. Berry corroborated the testimony of George Scheidt as to the meeting with appellant in front of the cigar-store. He testified that he thought appellant was drunk from "the way he acted and the way he talked at that time"; that he smelled whisky on his breath and that after the first accident he talked to appellant, who said he did not know how the accident happened and that "he didn't hit nobody." His testimony concerning the second accident corroborates that of George Scheidt. He testified that after the second accident Moss, who was riding with appellant, got out of the car and remarked that he had told appellant not to drive the car so fast because he was not in a condition to drive it that fast. On cross-examination he said he "saw him go backwards and forwards a little bit" in explaining appellant's condition before the deceased was struck. An attempt was made to impeach this witness' testimony by showing that at the coroner's inquest he did not testify that appellant was staggering and he explained that he was not asked that question. His testimony was that appellant staggered down the road "just like that," illustrating, after the accident, and at the coroner's inquest he had testified that he did not, at that time, after the accident, observe anything peculiar in appellant's walk. He also testified that appellant was nervous and excited after the accident to the deceased, but was not near the injured man and made no attempt to have him safely conveyed to a hospital. It appears that at the coroner's inquest he testified appellant was "right by the motorcycle" and that he said "to get him into this car and get him to the hospital."

The witness also testified on cross-examination that the steering gear of appellant's car was stiff, but that he made

no examination of the cause; that appellant staggered from his car over to the witness' car after the second accident; that at the A B C garage in Fresno, where he took appellant after the second accident, appellant told the garageman to get his car, described it, stated who he was and he would pay for it; that after he took him to the hotel he staggered when he got out of the car; and that he did not see him stagger at the garage because he walked ahead of appellant. On redirect examination this witness testified that the gear of appellant's automobile steered "just a little hard, but a man that is used to driving an automobile can drive it any place"; and that the zigzag movements of appellant's car between the first and second accident were not the result of the condition of the steering gear. He further testified that when the second collision occurred with the truck and trailer the tire on the left front wheel of appellant's car blew out.

Charles Bass, who was riding in the truck when it was struck by appellant's car, testified that appellant "was plainly drunk" and he could distinctly smell liquor on his breath; and that appellant told him "about sixteen or seventeen times he was no bum and wasn't going to run away." On cross-examination he testified that the impact of the Hudson coach bent the axle of the trailer and knocked the hub off.

L. W. Kemp, one of the floor men at the A B C garage, testified that between 12 and 1 o'clock on the morning of February 27th appellant, accompanied by another man, came into the garage; that he talked to him about five or ten minutes; that he seemed sober and it did not occur to him that he was intoxicated; that when the Hudson car was taken to the garage it had a tire blown out on the left front wheel, the axle was bent, the bumper torn off and the left fender was bent.

Thomas E. Collins, a brother of appellant, testified that he had been at the Collins Hotel in Fresno during the day of February 26th; that he left for home about half-past 8 or 9 o'clock every night; that he was not at the hotel at the time A. L. Berry testified that he gave appellant fifteen dollars with which to pay George Scheidt, Moss and himself for their services; that about 10 o'clock the next morning he talked with appellant and that he was sober; that between 12 and 1 o'clock appellant went home with him and stayed

there until half-past 1 and that during that time he was sober. A. L. Berry had testified that he saw appellant at 1 o'clock and that he was drunk at that time.

Mrs. Ellen Collins, wife of appellant, testified that on the night of the accident she was at the hotel; that at about 12 o'clock her husband came home; that she was awakened; that he was perfectly sober; and that he was sober the next day.

The testimony of the housekeeeeper at the parish house concerning appellant's sobriety prior to the accident in which deceased was injured has already been mentioned; as well as that of Mrs. Elizabeth McNamara, who was with appellant until about half-past 10 on the evening in question.

Two witnesses, W. A. Bean and Henry Avila, testified to the general reputation of appellant for sobriety.

The following testimony relates chiefly to the operation of appellant's car on the wrong side of the road when approaching another motor vehicle.

James Cross testified that on the night of the accident he met a motorcycle with a carrier about three miles and a half out of Hanford; that it had very good lights and "was going at a very slow clip," about twenty-five or thirty miles an hour, and was on the right side of the road.

Leonard Coburn, a surveyor and engineer, testified concerning a drawing which purported to show the place where the deceased was injured. He identified a portion of the highway and the railroad track which was about four feet above the highway, the fence with the broken wires, a broken fence post, and the spot where the grass had been smashed down and smeared with grease which was about eight feet from the westerly edge of the paved highway, and the two tracks "caused by slipping rubber tires, tires of an automobile, starting from the point here on the highway, and going more in a westerly direction, till it ran onto the railroad embankment perhaps eight inches or a foot . . . the car had apparently set its brakes and left the marks on the highway." He also testified that about two miles north of the place the deceased was found there was a spot very similar to the one above mentioned where the car had gone off the highway and swerved into the fence and broke it down. This witness identified a bottle, two pieces of iron

which were a hub cap marked "L. A. Trailer Company," which were found next to the fence, south of the car.

Charles Bass testified that he and A. E. Fiske were coming from Stockton in the latter's Dodge truck and trailer on the night of the accident and "about three miles north of Goshen Junction, and there is a car coming zigzagging along the road, and if I recall well, with one light"; that it slanted across the highway and ran into the running-board of the Dodge car, hit the trailer, circled and hit the fence; and that he took the number of the car and the name of appellant on the registration certificate.

Charles Crum testified that on the night of February 26th he and his nephew were proceeding south from Fresno to Tulare and seeing "lights shining over toward the railroad" he decided to stop and saw a motorcycle with a side car on the west side of the highway facing northwest and about five or six feet off the highway; that he saw the deceased, George Scheidt and A. L. Berry, who asked him to take deceased to Tulare to the hospital; that he sat in the back seat with the deceased holding him in his arms; that the deceased said to hurry, " 'I am dying,' he says, 'I can't live' "; that he repeated this several times before they reached the hospital; that the deceased said "he tried to get out of this man's way, but he kept on coming towards him and he said he couldn't get out of reach of him" and that he was on the right-hand side of the road going south at the time he was struck.

Marvin Crum, a nephew of the last witness, who was present at the time, corroborated a part of the foregoing testimony, but said he did not hear the declarations of the deceased as he was driving the car.

W. F. Seaman testified that on the night in question he met Charles and Marvin Crum with the deceased and they took him to the hospital; that he was very badly injured and called for the doctor; that in the presence of the nurse and Charles Crum the deceased said "he was coming south to Tulare on his motorcycle, driving just as far on the edge of the west side of the highway as he could drive, and this big car came along and deliberately, he said, well, he said it deliberately shot square across the highway on an angle like that, and struck his motorcycle and he had no

chance of getting out of the way. Those were the words
that Mr. Hawks used."

Mrs. Lillian McCarthy, sister-in-law of deceased, testified
that she saw him at the San Joaquin Hospital in Tulare;
that the wife of deceased and a Miss Hickey were there
also and that she "asked him if he could tell me what hap-
pened, and he said, 'yes.' He said he was hit by an auto-
mobile, and I said, 'Were your lights all right?' He said,
'Yes.' And I said, I asked him if he was on his own side
of the road, and he said 'Yes,' he said, 'He came right
straight for me, and I couldn't get out of his way'; and I
said to him, 'Did he render you any assistance in any way?'
and he said 'No.' "

[9] In aid of the discussion we have set forth the evi-
dence somewhat in detail and it is abundantly clear from the
summary thereof that it is sufficient as matter of law to
establish at least two propositions of fact—(1) that the
appellant was in a state of voluntary intoxication at the
time of the accident, and (2) that he was driving the car
on the wrong side of the highway when approaching an-
other motor vehicle, and that one or both of these proposi-
tions was the proximate cause of the death of the deceased.
It was attempted to show some contradictions and inconsis-
tencies in the testimony, but it was within the province of
the jury to harmonize as far as possible the evidence as a
whole in resolving it into facts. On appeal all conflicts must
be resolved on the side of the judgment. It is not disputed
that appellant was driving on the wrong side of the highway
and it is well within the record to declare that while the
jury in its appeal for leniency stated that the verdict is
based on the unlawful operation of the automobile on the
wrong side of the highway, this is not to be taken as the
equivalent of an implied finding that appellant was not
intoxicated when his car inflicted injuries which caused the
death of the deceased.

We will now consider the application of the evidence to the
law involved. The charge is manslaughter. Section 192 of
the Penal Code provides: "Manslaughter is the unlawful
killing of a human being without malice. It is of two kinds:
1. Voluntary—upon a sudden quarrel or heat of passion.
2. Involuntary—in the commission of an unlawful act, not
amounting to felony; or in the commission of a lawful act

which might produce death, in an unlawful manner, or without due caution and circumspection.''

Under this definition two elements enter into voluntary manslaughter—(a) when it is committed upon a sudden quarrel, or in the heat of passion. Involuntary manslaughter may be committed (b) in the commission of an unlawful act not amounting to felony, or (c) in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection.

Appellant, as we have seen, contends that section 367e has created a new felony which has taken the place of involuntary manslaughter and that the charge should have been prosecuted thereunder.

The theory of the prosecution was that the appellant was guilty of intoxication and of driving on the wrong side of the highway and we will therefore set forth the pertinent provisions of the law as it stood at the time of the accident.

Section 367d of the Penal Code provides: "Any person operating or driving an automobile, motorcycle or other motor vehicle who becomes or is intoxicated while so engaged in operating or driving such automobile, motorcycle or other motor vehicle shall be guilty of a misdemeanor."

Section 367e of the Penal Code reads: "Any person operating or driving an automobile, motorcycle or other motor vehicle who becomes or is intoxicated while so engaged in operating or driving such automobile, motorcycle or other motor vehicle, and who by reason of such intoxication does any act, or neglects any duty imposed by law, which act or neglect of duty causes the death of, or bodily injury to, any person, shall be punishable by imprisonment in the state's prison not exceeding five years, or in the county jail not exceeding one year, or by fine not exceeding five hundred dollars, or by both such fine and imprisonment." (Stats. 1911, p. 288.)

The Vehicle Act declares:

"Sec. 17. No person who is under the influence of intoxicating liquor . . . shall operate or drive a motor or other vehicle on any public highway within this state. Any person violating the provisions of this section shall be punished by imprisonment in the county jail for not less than six months nor more than one year or by imprisonment in the state prison for not less than one or more than three years or

by a fine of not less than five hundred dollars nor more than five thousand dollars." (Stats. 1919, p. 214.)

"Sec. 20. (a) The driver or operator of any vehicle in or upon any public highway shall drive or operate such vehicle in a careful manner with due regard for the safety and convenience of pedestrians and of all other vehicles or traffic upon such highway, and wherever practicable shall travel on the right-hand side of such highway. Two vehicles which are passing each other in opposite directions shall have the right of way, and no other vehicle to the rear of either of such two vehicles shall pass or attempt to pass such two vehicles. On all occasions the driver or operator of any vehicle in or upon any public highway shall travel upon the right half of such highway unless the road ahead on the left-hand side is clear and unobstructed for at least one hundred yards ahead and in all cases while crossing an intersecting highway. . . .

"(b) Vehicles proceeding in opposite directions shall pass each other to the right, each giving to the other one-half the road as nearly as possible." (Stats. 1919, p. 215.)

"Sec. 32. (a) Excepting as in this act otherwise provided, or where a different penalty is expressly fixed by this act, any person violating any of its provisions . . . shall be guilty of a misdemeanor, and upon conviction thereof, unless in this act otherwise provided, shall be punished by a fine not exceeding five hundred dollars or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment." (Stats. 1919, p. 225.)

No change was made in the foregoing provisions by the legislature of 1921, but in 1923 the "California Vehicle Act" (Stats. 1923, p. 517) was enacted, recasting the law, making a number of modifications and creating several new crimes punishable as felonies and a number of additional misdemeanors. To illustrate the character of changes, section 112 (Id., p. 553) thereof, makes the punishment for conviction of driving while under the influence of intoxicating liquor imprisonment in the county jail for not less than ninety days nor more than one year, or by imprisonment in the state prison for not less than one nor more than three years, or by a fine of not less than $200 nor more than $5,000. Section 112 is an amendment of section 17 of the "Vehicle Act" of 1919. Section 121 (Id., p. 557) provides that any

person who knowingly and willfully drives any vehicle upon a public highway, either without due caution and circumspection, or in such manner as to endanger the life, limb, or property of any person, shall be guilty of reckless driving and upon conviction shall be punished by imprisonment in the county jail for a period of not less than five days nor more than ninety days or by a fine of not less than $25 nor more than $250, or by both such fine and imprisonment. Section 141 is new and makes it a felony to fail to stop in case of collision, the punishment being imprisonment not exceeding five years in the state prison or not exceeding one year in the county jail. Section 28 of the 1919 act made the punishment for driving a car without the owner's consent imprisonment in the state prison for not less than one year nor more than five years. Section 146 of the 1923 act adds certain acts to the crime prescribed in the 1919 act and provides that a violation thereof shall be deemed a felony, which under section 18 and 18a of the Penal Code the minimum punishment would be six months and the maximum five years in the state prison. For additional misdemeanors by the act of 1923, see sections 135 (c), 147, 148, 149, 150, and 153 (b).

The crime charged against the appellant was alleged to have been committed on February 26, 1923, and the foregoing statutes of that year did not go into effect until August 31st following. They are not therefore applicable to this prosecution but we have referred to them merely to show the tendency to prescribe additional crimes for the unlawful operation of vehicles which in cases of death resulting from a violation of the "California Vehicle Act" may be intended to form a basis of prosecution for either murder or manslaughter.

We will next consider appellant's contention that the adoption of section 367e superseded the statute of involuntary manslaughter. No ground appears to us for holding that the adoption of section 367e had the legal effect claimed. For instance, it makes a neglect of duty which merely results in bodily injury the same crime as when such neglect results in death, and, of course, mere bodily injury would not justify a charge of manslaughter. To hold that the legal effect of section 367e is to withdraw from the crime of involuntary manslaughter all prosecutions where death

is caused by intoxication is to impute to the legislature an
intention to eliminate from that offense prosecutions for
perhaps the most prolific source of fatal accidents and
thereby reduce the maximum punishment for such offenders
by one half. That is not the tendency of recent legislation.
Thus, section 367d, adopted in 1911, which we have quoted,
prescribed a misdemeanor punishment for any person who
is or becomes intoxicated while engaged in operating or
driving such vehicles; but sections 17 of the 1919 act and
112 of the 1923 act make driving in such intoxicating con-
dition a felony. Judging from the increased number of
felonies prescribed by the legislature for violations of the
motor vehicle law, subsequent to section 367e, it is more
likely that in adopting such provisions it was intended to
create a more drastic law for cases of death or bodily injury
due to intoxication. It may have been intended to make
such acts in proper cases the basis of a prosecution for either
murder or manslaughter. [10] In cases where either felo-
nious or misdemeanor punishment may be imposed for the
criminal act the charge may be prosecuted as a felony.
In *People* v. *War*, 20 Cal. 117, the defendant was indicted
for a felonious assault in the use of a deadly weapon with
the intent to inflict upon the person of another a bodily in-
jury. The punishment prescribed for the said offense was
either by confinement in the state prison or the payment
of a fine. Upon the grounds hereinafter stated a demurrer
was interposed by the defendant and sustained. From the
judgment entered thereon the state appealed. In criminal
actions the supreme court at that time had appellate juris-
diction in cases of felony only, and the indictment not hav-
ing characterized the criminal act as a felony it was urged
by the defendant on appeal that it is not sufficient to show
that if prosecuted further the offense might have amounted
to a felony; that it must be a felony at the time the appeal
is taken and that the indictment does not show whether de-
fendant is accused of a felony or a misdemeanor. In re-
versing the judgment and directing the court below to give
judgment for the state on the demurrer, with leave for the
defendant to plead to the indictment, the court said: "The
discretion given as to the punishment certainly does not
make the same act two offenses, and it would be a singular
consequence if the fixing alternative punishments belonging

to different classes of crimes should prevent a criminal act from being indictable as any crime. We think, however, there is no uncertainty as to the grade of the crime charged. 'A felony is a public offense, punishable by death or by imprisonment in a state prison. Every other public offense is a misdemeanor.' (Act to Regulate Proceedings in Criminal Cases, secs. 4, 5.) [11] Under these definitions any offense which may be or is liable to be punished by death or imprisonment in the state prison, is a felony. Any offense which is not liable to such punishment—that is, for which that grade of punishment cannot under any circumstances be inflicted—is a misdemeanor. Although the offense charged in this indictment may, in the discretion of the Court in any particular case, be only punished by a fine, yet the offense is one which is punishable, which is liable to be punished, by imprisonment in the state prison, and hence it must be prosecuted with the forms and solemnities of a crime of the grade of a felony.''

This is also true of a case of death resulting from a violation of section 17 of the Vehicle Act, for that section also provides for felonious punishment although the extent thereof varies from that prescribed by section 367e. However, if felonious punishment is not imposed, thereafter the crime for all purposes shall be deemed a misdemeanor. (Sec. 17, Pen. Code.)

It would follow that under section 17 of the Vehicle Act and section 367e of the Penal Code, as those provisions stood in 1919, manslaughter was properly charged against appellant and we will now proceed to consider whether under the evidence and the legal tests we have applied appellant is guilty of that offense.

[12] To constitute involuntary manslaughter death may be due either to the commission of an unlawful act not amounting to a felony, or to the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection. We have said that the evidence would support a finding that appellant at the time of the injury was driving on the wrong side of the highway. This as we have shown is an unlawful act constituting a misdemeanor, thus bringing the case within the first sentence of subdivision 2, section 192.

As previously stated, the evidence is sufficient to sustain a finding that appellant was in a state of voluntary intoxication when the collision occurred. This would be an unlawful act amounting to a felony.

With regard to the next element in involuntary manslaughter—the commission of a lawful act in an unlawful manner or without due caution and circumspection—the driving of the automobile on the highway was a lawful act but the jury might have found that it was operated in an unlawful manner—either by having been driven on the wrong side of the highway or by appellant being in a state of voluntary intoxication, or by both. If the jury had so found the death of the deceased might have been traced either to the commission of a misdemeanor—driving on the wrong side—or a felony—being in a state of voluntary intoxication.

Under the circumstances it will serve no purpose to consider the remaining element—without due caution and circumspection.

We conclude that appellant was properly prosecuted for manslaughter; [13] that a violation of section 367e may be prosecuted either as a distinct crime of felony or be made the basis of a prosecution for manslaughter; that the evidence would support findings that appellant was driving on the wrong side of the highway and that he was in a state of voluntary intoxication, and that either act would support the verdict.

## IV.

The fourth ground of appeal is that "the court erred in permitting the introduction of other testimony during the course of the trial, which errors were extremely prejudicial to the rights of the defendant." Appellant contends that the testimony of the second accident was improperly admitted for two reasons: (1) because the facts relating to the second accident did not in any way form a part of the *res gestae,* and (2) because the relation by the witnesses of the facts concerning the second accident constituted evidence of a separate and distinct offense, to wit, reckless driving, as defined in the Vehicle Act, and that it tended to prejudice the minds of the jurors against the appellant.

We have sufficiently set forth the testimony relating to the second accident. The evidence thereof, of course, does

not tend to prove that the appellant was driving on the wrong side of the highway at the time he collided with the motorcycle; but it does tend to prove that appellant was carelessly operating his automobile during the journey from the scene of the first accident to the second. With regard to appellant's objection to the admission of this testimony that it tended to prove the commission of another offense—reckless driving—than that with which he was charged, it may be remarked that ''reckless driving'' was not made a crime until after the offense at bar was committed. The exceptions to the rule that evidence of other crimes is not admissible are well recognized, but appellant contends that ''the evidence improperly introduced by the prosecution in this case does not fall under any of the exceptions to the general rule. . . . And certainly the second collision in this case cannot be claimed to be any part of the *res gestae,* happening at a place seven miles from the scene of the fatal accident and about an hour thereafter, and with equal certainty it can be said that the fact of a second collision 'does not tend logically, naturally and by reasonable inference' to establish any fact material to the proof of the alleged crime.'' Respondent points out that the evidence of the second accident was not offered as a part of the *res gestae*—it ''was offered for the express purpose of showing that the defendant was in an intoxicated condition. Incidentally, and in the course of proving the defendant's intoxicated condition, evidence of the second accident was inseparable from and a logical part of the testimony offered to establish this intoxicated condition, that is, the proving of the second accident was merely an incident in the proving of defendant's intoxicated condition.'' **[14]** The intoxication of appellant was an issue in the case and it was therefore proper to prove that he was intoxicated at the time and evidence of his condition both before and after the accident was relevant if it tended to show his condition when the deceased was struck, even though ''it may tend to prejudice the defendant in the minds of the jurors by inducing the belief that he had been the perpetrator of another crime.'' (*People* v. *Nakis,* 184 Cal. 105, 114 [193 Pac. 92, 96].) It is required that the period of time be such ''that the condition may be reasonably supposed to be continuous.'' (1 Wigmore on Evidence, 2d ed., sec. 235.) The second accident occurred an hour after the

first and it was for the jury to determine whether his condition on the second occasion was a continuation of that on the first. The remoteness of the testimony would go to the weight and not to its admissibility. (Sec. 1870, subd. 15, Code Civ. Proc.; 10 Cal. Jur. 798.) We perceive no error in the ruling.

## V.

[15] The fifth ground of appeal is that the court erred in instructing the jury as to matters of law. From the following instruction appellant contends "the jury might well infer that because the accident itself happened, the defendant was not driving his automobile with 'due regard for the safety and convenience of pedestrians':

"If you find that the defendant was wilfully and unlawfully driving an automobile upon a public highway in a manner not then and there careful, and without due regard for the safety and convenience of pedestrians, and all other vehicles upon such highway, and that said unlawful act by him was the proximate cause of the death of said Lewis Hawks, then I instruct you that the said defendant is responsible under the criminal law, regardless of whether or not the said Lewis Hawks' failure to use due care for his own safety contributed to his death."

It was apparently intended by the entire instruction to convey the idea that if appellant violated the law the contributory negligence of the deceased, if any, would not excuse the crime. There was no evidence that the deceased did not use ordinary care and his dying declaration would indicate he was entirely free from blame. In any event we do not think appellant was prejudiced by the closing sentence. [16] Appellant also contends that the technical words of "negligence," "measure of care," or "proximate cause" are not defined in this instruction. These are terms used in civil suits and moreover appellant did not propose or request that such definitions be given. The other instructions to the jury included one to the effect that if the injury caused death then the wound "is to be regarded as the cause of death." The appellant contends that the jury should have been instructed that he "was under no legal duty to accompany the deceased . . . from the scene of the accident to the city of Tulare." It is shown by the evidence that appel-

lant saw that the deceased was put in the care of proper persons and it did not seem to be necessary that he should go to the hospital with the others. It does not appear that he refused to render any aid. It is claimed that counsel for the prosecution mentioned the failure of appellant to accompany the party to the hospital. Assuming that the proposed instruction contained a statement of a legal principle, we are unable to see how the failure to give it injured appellant.

## VI.

[17] Under this assignment of error the appellant contends that the district attorney was guilty of prejudicial misconduct in making "numerous improper statements and arguments" to which exception was made at the time. It appears that the stenographer who reported the trial did not take down in shorthand any of the argument of the district attorney, and it is asserted that for this reason the appellant is not able to present the facts concerning the misconduct. It does not appear that appellant otherwise attempted to present a record covering the alleged misconduct, and in the absence of such a record we are unable to pass on the merits of the point.

The judgment and the order denying the motion for a new trial are affirmed.

Richards, J., Seawell, J., Waste, J., and Shenk, J., concurred.

LENNON, J., Concurring.—I concur in the judgment of affirmance.