[Crim. No. 1623. In Bank.—October 18, 1911.]

THE PEOPLE, Respondent, v. HORACE BENNETT, Appellant.

CRIMINAL LAW—MURDER IN FIRST DEGREE—EVIDENCE.—In a prosecution for murder, the evidence is held sufficient to sustain the verdict of murder in the first degree.

ID.—INTENT—TIME OF DELIBERATION—INFERENCE OF INTENT.—In order to constitute such crime, there need be no appreciable time between the formation of the deliberate intent and the act of killing, and the intent itself may be inferred from the circumstances of the unlawful act.

ID.—APPEAL—APPROPRIATENESS OF VERDICT FOR LESSER CRIME.—It is not for the appellate court to declare that a lesser verdict would meet the ends of justice where the verdict actually rendered by the jury finds support in the evidence.

ID.—NEW TRIAL—ORDER REFUSING—APPEAL—NEWLY DISCOVERED EVIDENCE—REPUTATION OF DECEASED FOR PEACE AND QUIET.—In such a prosecution, testimony of the bad reputation of the deceased for peace and quiet is admissible only when it tends in some way, in connection with the immediate circumstances of the homicide, to show that the defendant had sufficient grounds as a reasonable man to fear that he was himself about to receive at the hands of the deceased some great bodily injury, and that he acted as a reasonable man under the influence of this fear in slaying the deceased. Alleged newly discovered evidence of such character will not warrant the reversal on appeal of an order refusing a new trial asked for on that ground, where, from the evidence given at the trial of the circumstances of the homicide, including the defendant's own account of the killing, it is not probable that a different result would be reached by the admission of such evidence.

APPEAL from a judgment of the Superior Court of Monterey County and from an order refusing a new trial.   B. V. Sargent, Judge.

The facts are stated in the opinion of the court.

A. E. Warth, and W. C. Shaw, for Appellant.

U. S. Webb. Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

HENSHAW, J.—Defendant, informed against for the crime of murder, was adjudged guilty of murder in the first degree and the death penalty was imposed.   From this judgment and from the order denying his motion for a new trial he appeals.

Upon appeal the contention is most earnestly urged that the evidence is insufficient to sustain the verdict of murder in the first degree, and that a verdict of manslaughter, at the most, is all that the evidence warrants.

The prosecution showed that John D. Stirling, the deceased, was foreman on a stock ranch in Monterey County; that defendant, previous to the homicide, had been employed upon the same ranch; that the deceased, finding him asleep when he should have been at work, reported the fact and defendant was discharged.   From his expressions concerning the matter defendant entertained some feeling of bitterness toward deceased upon that account.   Defendant obtained employment upon a neighboring ranch.   The two met about 11 o'clock in the morning at the Brockman House bar in the town of Gonzales, and there spent their time until 4 or 5 o'clock in the afternoon.   They drank together, played cards together, and several times the defendant borrowed small sums of money from the deceased.   During this time the defendant accused Stirling of having caused him to be discharged.   Stirling replied that he had done no more than his duty, and that the defendant had no occasion to harbor ill feeling against him on that account. The defendant replied, "Well, I have no personal feelings, but I know you are the cause of it."   More than once the conversations turned upon the fencing of a gap in the hills, defendant declaring that he had been instructed to fence this particular gap, the deceased objecting to it, declaring that he used the

gap in the "rodeoing" of his cattle, and if he found the fence there he would tear it down, and would tear it down as often as it was built up. The two men continued to drink, and as the day wore on their conversation, always harking back to the fencing of the gap, grew more and more acrimonious, until the proprietor feared there would be a fight. He asked the deceased to leave the place to avoid trouble. At this time both men were angry. The deceased replied that he would make no trouble, and did promptly leave the place, going to a nearby saloon. Before he left, however, the deceased had asked a friend in the saloon to lend him his pistol to carry while he was rodeoing, as he had broken his own. The friend assented. His pistol, with its belt and cartridges, was behind the bar, and the barkeeper put them on the counter for the deceased to take. Deceased said that he did not want the pistol at that time, but would take it before he left town, and the barkeeper replaced it. It is in this connection urged by the defense that defendant heard the deceased ask for the pistol, and assumed that he was armed. But if he heard this part of the conversation, it is a fair inference that he heard the rest of it, and thus knew that the deceased did not take the pistol and was not armed. About ten minutes after deceased's departure defendant left the saloon, went to a nearby store and purchased a revolver and some cartridges, loaded it, thrust it in his pocket, and went to Scattini's saloon where deceased was. Entering, he invited the deceased and the barkeeper to drink with him and they did. After drinking, the two men engaged in conversation, and again that conversation turned upon the fencing of the gap. The barkeeper testifies: "Bennett and Stirling were standing by the barrel I should judge fifteen or twenty minutes, and chewed the rag about that gap. They were talking in an angry voice and pretty loud, but I didn't hear any profane language used or curse words of any kind. I gathered from their conversation that there was a spring of water somewhere around that gap, where cattle went to drink. Bennett said that his boss requested him to close up that gap so people or cattle couldn't pass through. Stirling said if it was closed up he would tear it down. Bennett and Stirling were not drinking at this time. They were feeling pretty good. Finally Stirling stepped up to Bennett and said, 'Since you were up there and chopped wood you have had it in

for me.' Jack Stirling slapped Bennett like that (illustrating with his open palm), and says 'Take this for that.' Stirling did not swear at Bennett. I am positive that Stirling's hand was open at the time he slapped Bennett's face. He struck Bennett on the left side of his face, but he didn't strike him hard. Stirling's left hand at that time was hanging down empty. As soon as Stirling slapped Bennett Bennett stepped back about a step, I think, and pulled out his gun and shot. Stirling was standing with both his hands open and extended along down the side of his body. Bennett said nothing before he pulled his gun. He pulled it very quickly. I think it was in his pocket but I had no time to look because it was very quick. As soon as the first shot sounded Stirling covered his face with his hands and stepped over and turned to the left and took three steps, seven or eight feet, and then he got another shot in his back and he fell. He fell right in front of the slot machine on his stomach and rolled over toward the bar. Bennett stepped forward after he had fired the first shot. Bennett then came forward with his pistol in his hand pointing at Stirling, and said, 'Who is the best man?' Stirling was on the floor at the time, and Stirling then said to Bennett, 'You are.' Bennett went outside and whistled and came back a second time, still with the pistol in his hand, approached within four or five feet of Stirling, pointing his weapon in Stirling's direction, and again asked Stirling who was the best man. Bennett was urged not to go into the saloon any more, that 'Jack was down,' and he replied, 'All right, I won't go.in. I have whistled to give myself up.' The powder in the pistol was black powder and the first shot, while it missed, was close enough to sting and powder-mark Stirling's face, and probably temporarily to blind him. This accounts for the fact that after the first shot he put his hands over his face and turned half staggering away. The bullet in the back caused the wound which was mortal. Defendant surrendered himself, with various remarks: 'Come up here. I have just shot a man to show what kind of a man I am. I am sorry I didn't hit him the first shot.' " A few hours after his arrest he stated, his remarks being voluntary and taken down in shorthand, "And when he hit me I shot him like a man. I started to shoot him in the face and the second shot I shot him in the back. I am sorry I ever shot a man in the back. There is only one

thing I am sorry for and that is that I shot him in the back."
Such is the evidence of the prosecution. The story of the defendant, unsupported by other evidence, is this: that he believed Stirling to be a reckless and desperate man, that he thought he was armed, that Stirling struck him, not with his open palm, but a severe blow with his fist, that he staggered from the blow, and saw Stirling, as he thought, attempt to draw a pistol, that believing his life was in danger he drew his own weapon and fired suddenly, that the black powder smoke obscured his vision, and that he fired again through the smoke without being able to see that Stirling's back was toward him. He had for some time contemplated purchasing the pistol, and bought it at this time for no other reason than that he was going that evening back to the ranch. No doubt defendant's passions were somewhat inflamed and his judgment somewhat in abeyance by reason of the whiskey which he had drunk. Nevertheless, the testimony is that he was not intoxicated, and even if he were his voluntary intoxication would afford no excuse for his crime. It is manifest that the jury rejected his account of the homicide and believed, as the evidence would warrant their believing, that he deliberately armed himself, sought out an unarmed man and either provoked the quarrel, or, when the quarrel arose, drew his weapon and shot him with malicious deliberation. It is, of course, well settled, that there need be no appreciable time between the formation of the deliberate intent and the act of killing, and the intent itself may be inferred from the circumstances of the unlawful act. (*People* v. *Hunt,* 59 Cal. 430; *People* v. *Suesser,* 142 Cal. 364, [75 Pac. 1093] ; *People* v. *Machuca,* 158 Cal. 62, [109 Pac. 886] ; *People* v. *Mahatch,* 148 Cal. 200, [82 Pac. 779].) It is not, of course, for this court to declare that a lesser verdict would meet the ends of justice where the verdict actually rendered by a jury from the vicinage finds support in the evidence given.

Defendant moved for a new trial upon the ground of newly discovered evidence, supporting his motion with affidavits of diligence. This newly discovered evidence is embraced in the affidavits of two men which are to the same effect: that they knew the reputation of the deceased for peace and quiet in the community wherein he lived and that that reputation was bad. Upon the trial defendant had attempted to establish the

same fact by two witnesses. But when the preliminary proof of knowledge was made as to one of these witnesses, the defense refused to ask the question touching deceased's reputation and the other witness, when asked, testified that he "never knew anything bad about the deceased." Testimony of this character is admissible only when it tends in some way, in connection with the immediate circumstances of the homicide, to show that the defendant had sufficient grounds as a reasonable man to fear that he was himself about to receive at the hands of the deceased some great bodily injury, and that he acted as a reasonable man under the influence of this fear in slaying the deceased. (*People* v. *Lombard,* 17 Cal. 316; *People* v. *Edwards,* 41 Cal. 640; *People* v. *Lamar,* 148 Cal. 564, [83 Pac. 993].) Usually this kind of evidence finds proper place where there is doubt as to who was the first aggressor, where the immediate circumstances of the homicide make it questionable whether the act was justifiable or not. Here, all the circumstances of the homicide were proven by the testimony of eye witnesses, and the defendant's own account of it would not be strengthened by the evidence which he sought to introduce. Admittedly, the deceased was the first aggressor. But this aggression took the form of a mere battery. The defendant himself does not say that the assault was of a deadly character. The defendant then immediately drew his weapon and fired. True, he says that he saw or believed he saw the deceased make a motion as if to draw his pistol, but this is discredited by the testimony of eye witnesses by the fact that deceased was unarmed and by the further inference of fact that defendant knew that he was unarmed. It is, therefore, not at all probable, that a different result would be reached by the admission of the newly discovered evidence, and the court's judgment upon the matter will not be disturbed. (*People* v. *Buckley,* 143 Cal. 390, [77 Pac. 169]; *People* v. *Oppenheimer,* 156 Cal. 745, [106 Pac. 74].)

For these reasons the judgment and order appealed from are affirmed.

Melvin, J., Sloss, J., Angellotti, J., Shaw, J., and Lorigan, J., concurred.