[No. 18478.  Department One.  April 15, 1925.]

THE STATE OF WASHINGTON, *Respondent,* v. CLAUDE A. LABBEE, *Appellant.*[1]

CRIMINAL LAW (155)—OPINION EVIDENCE—TESTIMONY OF PHYSICIAN—ADMISSIBILITY.  In a prosecution for murder, it is competent for a physician who examined a wound from a revolver shot to testify that it could have been inflicted whether the accused was lying down or standing.

SAME (104)—EVIDENCE—RES GESTAE—STATEMENTS OF PERSON INJURED.  A statement made in answer to a question ten or fifteen minutes after a shooting and upon gaining consciousness that the accused had fired the shot is admissible as part of the *res gestae.*

SAME (104, 136)—EVIDENCE—RES GESTAE—IMPEACHMENT BY SUBSEQUENT STATEMENTS.  A statement made as part of the *res gestae,* ten or fifteen minutes after being shot, which was spontaneous and instinctive, cannot be contradicted by evidence of a contrary statement made four days later.

SAME (54)—FORMER JEOPARDY—ACQUITTAL—IDENTITY OF OFFENSES.  An acquittal of murder on the ground of self-defense, in a shooting scrape in which a bystander was also killed by a shot from the accused's revolver, is not a bar to a subsequent charge of murdering the bystander, where there is no evidence to support the theory that the bystander was accidentally killed by the accused in defending himself from the assault by the deceased, but on the contrary it appears that the bystander was shot and killed to put out of existence the only witness to the entire tragedy.

SAME (316)—TRIAL—INSTRUCTIONS—REQUESTS.  It is not error to refuse an instruction sufficiently covered in another.

HOMICIDE (111)—TRIAL—INSTRUCTIONS—SELF-DEFENSE.  Where accused claimed that he accidentally shot a bystander while defending himself from an assault by another, error cannot be assigned upon the giving of an instruction on the subject of self-defense which was preliminary to instructions as to an accidental killing while defending himself.

Appeal from a judgment of the superior court for Yakima county, Gilbert, J., entered May 7, 1923, upon a trial and conviction of murder.  Affirmed.

[1]Reported in 234 Pac. 1049.

*H. J. Snively,* for appellant.

*Sydney Livesey* and *M. C. Delle,* for respondent.

MAIN, J. — The defendant was, by information, charged with the crime of murder in the first degree. To the information he pleaded not guilty, and also interposed a plea of former jeopardy by acquittal. The jury returned a verdict finding him guilty of murder in the second degree. A motion for a new trial being overruled, judgment was entered upon the verdict, and this appeal followed.

Preliminary to a consideration of the questions presented, the following will be a sufficient summary of the facts. L. A. Wright and Odessa Wright, his wife, for some years had lived on a ranch in Yakima county. The appellant, Claude A. Labbee, and his wife had lived on a neighboring ranch and about two miles distant. The families had been friends. For a number of years improper relations had existed between Mrs. Wright and the appellant. On the evening of June 30, 1922, by appointment he met her at 9:15 p. m. at the corner of what is referred to as the horse corral on the Wright place, which was not a great distance from the house. The appellant had approached this place that evening, leaving his automobile in the road some distance away and walking through the sagebrush. While they were there, Mr. Wright came out of the house and came upon them, and very soon a shooting began. Wright was wounded in the thigh, in the abdomen and in the head, from which he soon thereafter died. The appellant had three flesh wounds, none of which were serious. Wright used a .32 caliber revolver and the appellant a .25. Mrs. Wright was shot in the forehead and a .25 caliber bullet, after her death, was found in her brain. She died on November 26, 1922, having continuously been in the hospital after she was shot,

in more or less of a semi-conscious condition. Labbee, the appellant here, was charged with the murder of Mr. Wright, tried and acquitted. After the death of Mrs. Wright, he was charged with her murder, with the result as above indicated. Other facts will be stated in connection with the discussion of the particular questions to which they may be pertinent.

The first assignment of error is with reference to the testimony of one of the doctors, who appeared soon after the shooting. After testifying as to the course of the bullet which struck Mr. Wright in the abdomen and saying that its course was not up and down but anterior to posterior, this occurred: "Q. In other words, if the party firing the shot might have been lying on the ground, had the defendant's position been this (indicating) in receiving that wound? A. He could have been. Q. And the party firing the shot might have been standing up and the defendant in nearly an erect position? A. Yes." These questions and answers do not present the question whether a doctor who has examined the wounds may testify as to the relative attitude of the deceased and the instrument or person inflicting the wound. They amount to nothing more than a statement by the witness that the wound could have been inflicted whether the appellant was standing up or lying down. The question reserved or left open in the case of *State v. Adamo,* 120 Wash. 268, 207 Pac. 7, which the appellant cites, is not the same as that here presented. We see no reason why the testimony objected to was not competent, and if it were incompetent, in view of all the other evidence in the case, it would only be a minor error without prejudice.

The second assignment of error is misconduct of the prosecuting attorney. There is no merit whatever in this assignment and it does not require a discussion.

The facts in the case of *State v. Montgomery,* 56 Wash. 443, 105 Pac. 1035, 134 Am. St. 1119, are entirely different from those in the present case.

The third assignment of error is that the declaration of Mrs. Wright soon after the shooting was not admissible as a part of the *res gestae.* Within a few minutes after the shooting she was picked up in the sagebrush outside the west line fence of the Wright ranch where she had come to meet the appellant, by men from the government reclamation camp, which was a short distance away, who, having heard the shooting, rushed to the scene of it. At first they thought she was dead and concluded not to move her until the sheriff or coroner should arrive. One of them noticing her move, they then picked her up and carried her into the house, where she was placed on a bed and seemed to regain consciousness. One of the men who carried her in asked her who did the shooting, and she said "Claude and Art." L. A. Wright, her husband, is referred to in the testimony as Art Wright. One of the other men almost immediately asked who shot her, and she answered "Claude Labbee." This was about five minutes after she had been carried into the house and ten or fifteen minutes after the shooting. Upon the trial, her answer as to who shot her was admitted in evidence, and it was clearly a part of the *res gestae.* The statements, even though in answer to a question, were nevertheless spontaneous and instinctive, and the surrounding facts and circumstances negative the thought that they might have been made with design or premeditation. In *State v. Goodwin,* 119 Wash. 135, 204 Pac. 769, upon this question it is said:

"It is plain that the statements made by Christianson within the short time which elapsed between the explosion and the time he was taken across the river,

in view of the testimony as to the considerable injuries which he had suffered, were statements which were spontaneously and instinctively made and raise a reasonable presumption that they were impulsive utterances of thoughts arising from the circumstances, and made so soon thereafter as to negative any presumption that they were made with design and premeditation.''

The fact that Mrs. Wright made the statement as to who shot her in response to a question does not destroy its character as a part of the *res gestae*. In *Lucchesi v. Reynolds*, 125 Wash. 352, 216 Pac. 12, it is said:

''The fact that the statements testified to by the officer had been elicited by his questions cannot militate against their reception. Of course, they were not involuntary exclamations, but they were none the less spontaneous and instinctive.''

The fourth assignment of error relates to the ruling of the trial court in refusing to permit the *res gestae* declaration of Mrs. Wright to be contradicted by a statement that it is claimed that she made four days later to a nurse in the hospital. There was no error in this regard. The two classes of evidence are entirely distinct. That which is a part of the *res gestae*, as already indicated, is spontaneous and instinctive and so closely connected with the transaction in question as to be in effect a part of it. The testimony offered was the narration of a past event and was hearsay. In vol. 2, Jones Blue Book of Evidence, p. 809, it is said, referring to circumstances which are to be considered a part of the *res gestae*:

''Their sole distinguishing feature is, that they should be the necessary incidents of the litigated act; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculated policy of the

actors. In other words, they must stand in immediate causal relation to the act—a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself.''

Whether *res gestae* declarations can be contradicted by subsequent statements made after deliberation and calculation is a question which apparently has never been determined by any adjudicated case or referred to by any text writer. The discussion of this question in the memorandum opinion of the trial judge upon the motion for a new trial cannot well be improved upon and it will be here adopted.

''Any statement that is a narration of a past event by a person who is not a witness in the case is hearsay, unless it comes under some exception to the rule.

''A statement made as a part of the *res gestae* is not a narration of a past event, for the reason that it is the event speaking through the person. It is not the person relating the event; it is not the recital of past occurrences. It is a part of the event. Therefore, it does not come within the hearsay rule.

''A dying declaration is a narration of a past event and is not excluded by the hearsay rule, for the reason that the utterance is made in the belief on the part of the speaker that dissolution is imminent and certain. Dying declarations are only recognized in the law of evidence in homicide cases, and in some jurisdictions in abortion cases. They are justified upon the theory that one who believes death is surely to come to him in the immediate future will speak the truth.

''It must be always borne in mind that a statement made as a part of the *res gestae* is not a narration of a past event and that a statement made as a dying declaration is a narration of a past event, and the law relating to the two must be construed with this distinction in mind. To forget this distinction is to break down the barriers against hearsay testimony and permit statements in evidence that may have been uttered with a purpose to deceive.

''The courts have permitted the impeachment of dying declarations by the admission of contradictory

statements by the deceased person. The reason is that a dying declaration is the narration of a past event and a narration of past events may be impeached by showing other contradictory statements.

"As said before, a statement made as a part of the *res gestae* is a part of the event; it is an act and not a statement of fact; it is a spontaneous utterance. Counsel on both sides and the court have searched in vain for any authority in the English speaking world which has permitted the impeachment of an utterance made as a part of the *res gestae* by other contradictory statements, which were not a part of the *res gestae*.

"There is no authority that would permit admission of the testimony of Mrs. Mauer. The theory upon which it was tendered is unsound and would be a dangerous innovation in the law of evidence. It would open the door to deceit, fraud and perjury; it would nullify the hearsay rule; it would permit the proof of a case by the state by hearsay testimony; it would permit a defendant to make out a defense by witnesses who might testify to fabricated statements by a deceased person.

"The fallacy of the defense' contention is illustrated in the case at bar. If the court had admitted this testimony of Mrs. Mauer, the state stood ready with many witnesses who would have testified, if permitted, that the deceased Mrs. Wright told them on various occasions in great detail of the shooting and stated that she was shot by the defendant. None of these statements were made under circumstances that would permit their introduction as dying declarations. They were all narrations of past events and were not a part of the *res gestae*. They are as logically a part of the case as the proposed evidence on the part of Mrs. Mauer. It is clear that neither should have been permitted, for the reason that both were hearsay, that all were narrations of past events and that none were a part of the *res gestae* and that none were dying declarations."

The case of *State v. Hazzard,* 75 Wash. 5, 134 Pac. 514, does not support the contention that the evidence of the nurse was admissible. In that case the evidence

was admitted as a part of the *res gestae,* while the evidence here offered was not a part of the *res gestae.* It was an attempt to prove by a statement of the nurse something that Mrs. Wright is alleged to have said some days after the shooting.

The fifth, sixth, seventh and eighth assignments of error relate to the ruling of the court with reference to the effect of the prior acquittal of Labbee, the appellant here, for the murder of Mr. Wright. It is the contention of the appellant that he was acquitted upon the former trial on the ground of self-defense and that the shooting of Mrs. Wright was a part of the same transaction. In other words, the contention appears to be that, if Labbee killed Mr. Wright in self-defense and at the same time shot Mrs. Wright, the acquittal of Labbee upon the former trial would be a complete defense in the present case. It is the rule that the accidental killing of a third person by the accused acting in self-defense would constitute justifiable homicide. The appellant offered in this case the files of the previous case and they were rejected. Before the killing of Mrs. Wright could be justified it was necessary to show that the two offenses were identical in both law and fact. In *State v. Elliott,* 69 Wash. 62, 124 Pac. 212, it is said:

"Moreover this court is firmly committed to the view that, to sustain the plea of former jeopardy, the offenses must be identical in both fact and law."

The appellant, in his plea of former jeopardy, alleged that, if the shot fired by him struck Mrs. Wright and inflicted upon her a mortal wound, it was fired while he was engaged in defending himself from an assault made upon him by L. A. Wright. The appellant upon the trial admitted the meeting with Mrs. Wright at the corner of the corral, the approach of Mr. Wright, the shooting, and testified that he did not see Mrs.

Wright after Mr. Wright approached and the shooting
began. He says that, on the approach of Mr. Wright,
he retired some little distance into the sagebrush and
concealed himself, and was there sought out and found
by Mr. Wright and the shooting there occurred. One
William Williams, who was at the time in the employ
of the appellant on his ranch, accompanied him on the
evening in question to a short distance from where the
tragedy occurred. They left the Labbee place in an
automobile which was driven by the appellant, and
when they approached the Wright place the automobile
was stopped, both getting out and walking towards
the corral. They saw Mrs. Wright coming from the
house and the appellant said to Williams to wait where
they then were. Williams testified that he heard the
fence squeak and the shooting immediately began. He
rushed up to where it was taking place, and at that time
Mr. Wright was lying on the ground. Labbee was
standing at his feet. Mrs. Wright was standing by,
screaming, and giving utterance to such exclamations
as "You have killed Art, now kill me." Williams
went to Mr. Wright's head, apparently for the purpose
of seeing what he could do for the wounded man. Lab-
bee then approached to where Williams was and said to
him, "Get back Bill, I am going to finish him." Mrs.
Wright was exclaiming to Williams to go for help. He
started to get the Labbee automobile, and, as he did so,
he testifies that he saw Labbee shoot Wright in the head.
After the matter· was over, Labbee returned to his
home. Williams was there and a son of the appellant.
Some blankets were spread for him to lie down on.
He then requested his son to go to the Wright place
and see if they were both dead, and stated to Williams,
as he testified, "He said I needn't worry, said nobody
would hurt me, he said he stuck to me and wanted me

to stick to him, he said if they was both dead for me not to talk, and he would go clear.''

There is no evidence in this case from which it can be inferred that the bullet that struck Mrs. Wright was one which was fired at Mr. Wright. The evidence offered by the appellant and rejected had no tendency to prove this fact. A careful reading of the evidence leads irresistibly to one conclusion, and it is apparently the conclusion which the jury drew, and that is, that the appellant, believing he had killed Mr. Wright, concluded to kill Mrs. Wright and thereby put out of existence the only living witness to the entire tragedy. The evidence offered and rejected had no tendency to prove that the two offenses were identical in either law or fact. The ruling of the trial court was correct.

The ninth assignment of error relates to the refusal of the court to give an instruction which embodies the thought if one while defending himself against assault unintentionally kills a third person he is not guilty of any offense. This same thought was carried into an instruction which the court gave and was applied to the facts in this case, and it therefore follows that there was no error in this respect.

The tenth assignment of error relates to instruction number 6, where it is admitted the right of self-defense is accurately defined. The objection to the instruction appears to be that it should not have been given in this case even though it embodied a correct statement of the law. The instruction was preliminary to another one in which the jury were told that if the appellant shot and mortally wounded Mrs. Wright, and ''if he then and there believed, and had reasonable ground to believe, that he was in imminent danger of death or great bodily harm or personal injury at the hands of one L. A. Wright, and was then and there lawfully defending himself against such 'apparent danger' to

his life or person, and in so doing shot and mortally wounded the said Odessa Wright by accident or misfortune, that is, without intent or design on the part of him, the said defendant, to shoot, mortally wound or kill her, that it will be your duty to acquit the defendant and find him not guilty." The objection to instruction number 6 is not well taken.

Assignments of error 11, 12, 13 and 14 challenge the correctness of other instructions given. It will be unnecessary to review these in detail. They have been carefully considered and in none of them is there substantial merit. The instructions are comprehensive and give evidence on their face of very careful preparation. They completely and correctly stated the law which should guide the jury's deliberations.

Assignments of error 15 and 16 relate to the ruling of the trial court in denying the motion for a new trial and are covered by what has been hereinbefore said.

The judgment will be affirmed.

TOLMAN, C. J., BRIDGES, PARKER, and ASKREN, JJ., concur.