[Crim. No. 3604. Second Dist., Div. Three. Nov. 28, 1942.]

THE PEOPLE, Respondent, v. ERNEST JIMINEZ VAIZ, Appellant.

William G. Kenney for Appellant.

Earl Warren, Attorney General, and Alberta Belford, Deputy Attorney General, for Respondent.

SCHAUER, P. J.—The defendant has been convicted of, and sentenced to life imprisonment for, murder of the *first degree*. ▐ On this appeal the sole contention is that "there is no evidence of wilful, deliberate premeditation" or of "the specific intent to kill" and, hence, that the evidence establishes at most murder of the *second degree*.

Concerning the degrees of murder Judge Fricke in his text, "California Criminal Law" (Los Angeles Review, 1927, pp.

68, 69) says: "In dividing murder into degrees the Legislature intended to assign to the first as deserving of greater punishment, all murders of a cruel and aggravated character, and to the second all other kinds of murder which are murder at common law, and to establish a test by which the degree of every case of murder may be readily ascertained. That test may be thus stated: Is the killing wilful (that is to say, intentional), deliberate and premeditated? If it is, the case falls within the first, and if not, within the second degree. There are certain kinds of murder which carry with them conclusive evidence of premeditation; these the legislature has enumerated in the code definition [Pen. Code, § 189]. . . . But there is another and much larger class of cases included in the definition of murder in the first degree, which are of equal cruelty and aggravation with those enumerated, and which, owing to the different and countless forms which murder assumes, it is impossible to describe in the statute. In this class the Legislature leaves it to the jury to determine, from all the evidence before them, the degree of the crime, but prescribes for the government of their deliberations the same test which has been used by itself in determining the degree of the other two classes, to wit: The deliberate and preconceived intent to kill. . . . The unlawful killing must be accompanied with a deliberate and clear intent to take life in order to constitute murder of the first degree."

In the case before us the fact of homicide was admitted but the defendant testified that he had had no intent to kill. Hence the only inquiry we need make on this aspect of the case is as to the legal sufficiency of the evidence to support the implied finding of the jury that the killing was premeditated and wilful. We conclude that the record supports the verdict, not the defendant's contention.

The crime of which defendant stands convicted was committed shortly after 6:30 on the morning of December 19, 1941. More than one year prior thereto and, specifically, on December 8, 1940, defendant and one Nasario Gonzales, hereinafter referred to as the deceased, had engaged in a quarrel. According to defendant the deceased had, on that occasion in 1940, wilfully and without provocation attacked defendant with a club, breaking the latter's left arm and injuring it so severely that, despite a bone-grafting operation, it still remained in a sling and unserviceable on December

19, 1941. The battery (of December, 1940) upon defendant, if we accept his statement concerning it (and such statement is not directly disputed), was a peculiarly cruel one. The deceased, it is said, not only knocked defendant down and crushed his arm, but continued to belabor him after he was down and helpless. A criminal complaint had been issued against deceased as a result of the 1940 affray but the case was dismissed when it came up for trial in the superior court on or about March 6, 1941. Immediately after the dismissal the defendant, in the hall outside the courtroom, was heard to say, ''If they don't do anything here, I will get even myself some other time.''

For about three months immediately preceding December 19, 1941, defendant had been carrying a .44 calibre Russian Colt revolver. He lived near the residence of deceased. He knew the route traversed by deceased every morning in going to work. At a point near defendant's home a ditch or washout in the street impeded vehicular traffic traveling the route which deceased followed in going to work. On the morning of December 19, 1941, deceased, with his brother Jose as a passenger, was driving an automobile along the street approaching the ditch and defendant's home. When the car was slowed down at a point about six or eight feet in front of the ditch deceased's brother Jose heard a gun shot; almost simultaneously his face was struck by broken windshield glass, and he observed that deceased suddenly released the steering wheel and slumped down in his seat. Nasario had been shot through the head and death ensued promptly. The witness Jose stopped the car and defendant stepped into view. The latter, brandishing a revolver, approached the vehicle on its left side and [apparently not knowing that Nasario was fatally wounded] called to the deceased to stop, applying a foul epithet to him. The brother, Jose, then left the car and fled. Defendant fired one shot in the direction of Jose but, designedly or otherwise, it did no harm. Defendant then walked to a police station and surrendered.

Concerning the motive for the shooting, a police officer testified that defendant related to him the story of the affray of December 8, 1940. According to the officer the defendant stated that at the time the case against the deceased was dismissed he (defendant) made up his mind ''that he was going to get even.'' The officer then asked, ''Have you carried this

grudge against this man for that period of time, since the 8th of December of last year?'' and the defendant replied, ''Well, yes, I guess that is what you could call it.''

Defendant in his own behalf testified in substance that he had sought to intercept the deceased on December 19 merely to ask him to reimburse defendant for the latter's expenses incurred by reason of the injuries previously inflicted by deceased, and, in default of such reimbursement, to ''get even'' to the extent of breaking deceased's arm just as the latter had previously broken defendant's arm. Defendant testified that deceased failed to heed his call to stop and that he then ''just shot at the car.'' However, on cross-examination, he admitted that as a witness at the inquest he had testified under oath, as follows: ''Q. When you fired, you meant to hit him, didn't you? A. Well, yes, I meant to hit him. Q. Could you have stopped him if you had fired at the tires? A. What if I missed? Q. You didn't shoot at the tires, though, did you? A. No. Q. So it was your idea to hurt him because he hurt you? A. At least to even up the fight.''

Furthermore, in a written statement made and signed by defendant and received in evidence, we find the following:

''Q—You have since that time carried a grudge in your heart against him [deceased], is that right?

''A—Yes, I have.

''Q—You have had the intention since that time to get even sometime, is that right?

''A—My intention was to make him pay my bills.

''Q—When you saw him thos morning was it your intention to get even with him in any way, or was it your intention to make him pay your hospital bills?

''A—It was my intention to make him pay my hospital bills and if he didn't I would give him the same thing he gave me.

''Q—When he failed to stop, you shot through the car window, is that right?

''A—Yes.

''Q—Did he say anything to you this morning?

''A—No, not a word.

''Q—Did Joe, his brother, say anything to you?

''A—No.

''Q—Did either of them have a weapon or make any move toward you this morning?

"A—Nothing at all.

"Q—When you fired the shot, you shot straight at Nasario Gonzales?

"A—I was shooting for Nasario and not for Joe. I didn't intend to shoot Joe.

"Q—Do you know whether Gonzales would have the money to pay your hospital bill or not?

"A—No, I don't know. . . .

"Q—Then you state the reason for your actions this morning in shooting Nasario Gonzales to be the result of the fight which you had with him a year ago, is that right?

"A—Yes, on account he had me crippled for life."

Also tending to overcome defendant's claim of relatively innocent intention in his attitude toward deceased is the testimony of a police officer relating a conversation with defendant as follows: "I said: 'Would you feel sorry for what you have done if the man dies?' And he said: 'No, I wouldn't.' He said: 'I would still feel the same way about it.' I said: 'Even if he dies, would you still not regret what you had done?' He said: 'No.' I said: 'Well, if he dies you have a murder charge staring you in the face,' and he said: 'Well, that's all right.' He said: 'I still think I got even.' " At this point the defendant was informed that the victim of his shooting had in fact died and the officer then asked him, "You still feel as though you have been justified in doing what you did?" The defendant answered, "Yes."

The existence of a deliberate purpose to kill, which, as above set forth, is essential to constitute murder of the first degree, in cases other than those specifically enumerated in section 189 of the Penal Code, may be inferred from the character of the weapon used, the circumstances surrounding and showing the relationship of the parties, and the acts and conduct of the accused (see 13 Cal.Jur., § 14, p. 597; *People* v. *Samsels,* (1884) 66 Cal. 99, 101 [4 P. 1061]; *People* v. *Peete,* (1921) 54 Cal.App. 333, 342 [202 P. 51]; *People* v. *Green,* (1939) 13 Cal.2d 37, 42 [87 P.2d 821]; *People* v. *Cook,* (1940) 15 Cal.2d 507, 514 [102 P.2d 752]; *People* v. *Smith,* (1940) 15 Cal.2d 640, 647 [104 P.2d 510]). It is obvious that the evidence hereinabove recited adequately supports the implied finding that the killing was premeditated and wilful.

There is another proposition of law which necessitates an affirmance of the judgment. While the defendant was testi-

fying on direct examination the following evidence was elicited: "Q. Now, Officer Burris has testified that you stated that if the decedent didn't pay your hospital bills that you were going to give him what he had given you. Do you remember telling him that? A. Yes, I did. Q. Now, did you tell him what you meant when you said you were going to give him what he had given you? A. Yes, I did. Q. All right. What did you tell Officer Burris? A. I told him that I would do to him like he did to me; that I would break his arm."

The testimony above quoted, construed with other admissions of the defendant and the surrounding circumstances, amply supports the conclusion that the deceased was killed in the course of an attempt by defendant to perpetrate mayhem (Pen. Code, § 203). Murder, committed in an attempt to perpetrate mayhem, is of the first degree (Pen. Code, § 189).

That the defendant had been subjected to great provocation by the deceased a year previous to the killing appears probable. It also may be assumed that with the collapse, in March, 1941, of the prosecution of the deceased for his asserted battery upon defendant it seemed to defendant that the processes of law were inadequate or unavailing and that justice and vindication could be his only as he wrought them by his own hands on standards understood by him and the deceased. We view with compassion the suffering endured by defendant from the acts of the deceased and the circumstances which guided defendant to his offense. But the welfare of the whole social state demands the allegiance of all its members to its laws. The defendant has violated one of the most solemn laws; he stands legally convicted. "It is not . . . for this court to declare that a lesser verdict would meet the ends of justice where the verdict actually rendered by a jury from the vicinage finds support in the evidence given." (*People* v. *Bennett*, (1911) 161 Cal. 214, 218 [118 P. 710].) However, it may be remarked that the state in its wisdom and concern for its weaker and more unfortunate members has provided the indeterminate sentence law and thereby vested in the Board of Prison Terms and Paroles a power and responsibility whereby the state, through such board, may with enlightened efficacy gauge the law to justice in its individual applications. The defendant may confidently expect the mem-

bers of that board to review and consider all the circumstances surrounding him and his victim and affecting his offense, when he comes before them for diagnosis and ministration.

The judgment is affirmed.

Shinn, J., and Wood (Parker), J., concurred.