[Crim. No. 1490.   Fourth Dist.   Mar. 15, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT B. DALTON, Defendant and Appellant.

Jerry Giesler and Ward Sullivan for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George W. Kell, Deputy Attorney General, for Plaintiff and Respondent.

COUGHLIN, J.—The defendant was indicted and tried by a jury for the offense of murder (Pen. Code, § 187); was convicted of murder in the first degree (Pen. Code, § 189); punishment was fixed at life imprisonment; was sentenced to imprisonment in the state prison; moved for a new trial which was denied; and appeals from the judgment entered and the order denying such motion.

The issues on appeal arise from the contentions of the defendant that:

1. The evidence is insufficient to sustain the verdict of murder in the first degree;

2. The trial court erred in instructing the jury that murder which is committed in the perpetration or attempt to perpetrate mayhem is murder in the first degree, as there was no evidence of mayhem;

3. The district attorney was guilty of prejudicial misconduct;

4. It was error to deny the admission into evidence of statements by the victim exculpating the defendant; and

5. His motion for a continuance to permit him to procure the testimony of a medical witness was improperly denied.

The defendant first became acquainted with the victim, John Larendon, in 1948, while the latter, a 74-year-old bachelor, was a patient in a New York hospital; was employed by Larendon as a companion and continued to live with him thereafter; was the donee of frequent gifts by Larendon, ranging in amounts from $3,000 to $10,000, also became the beneficiary of an irrevocable trust created by the latter in the sum of $250,000; moved to California in 1957; received a residence in La Jolla as a gift from Larendon, where both of them took up their abode; and, in 1960, became coowner with Larendon of property in Pennsylvania which was purchased for $150,000.

There is substantial evidence indicating that over a period of years the defendant exercised a dominating influence over Larendon; caused him to defy his New York attorney's advice and effect the termination of a revocable trust in the original amount of $620,000, resulting in a transfer of the assets

thereof to a bank in San Diego; verbally abused him, calling him foul and obscene names, referring to him as an old fool and telling him to shut up; physically mistreated him, pushing him about and striking him on the shoulders, face and head; and threatened him on several occasions, saying he was going to beat him, that he had better do what he was told to do or "you know what will happen to you," and that he could kill him and nobody would find out about it. The evidence supports the conclusion that the defendant's domination over Larendon was so complete that the latter bore this mistreatment without complaint and seemed to live in fear that the defendant might leave him.

On the evening of November 19, 1960, the defendant and Larendon returned from Pennsylvania, where they had gone a short time before, and not having a key to gain admittance to the La Jolla residence, the defendant, with the assistance of a taxi cab driver, forced open and gained entry through a bathroom window.

This occurred in the early evening. Later that night they retired to their respective bedrooms. According to defendant's story, at about 7 o'clock the next morning, upon opening a patio door to permit his dog to go outside, he observed broken glass around the door; went into the kitchen, and noticed that the back door was open; immediately went back through the house and into Larendon's room; found Larendon in a "bloody mess sitting in his chair"; asked him what happened and was told that he did not know; went to the bathroom, procured some towels, returned, lifted Larendon's right leg which was bleeding, placed it on one of the towels, and covered it with another; caused a doctor to be summoned; and awaited the latter's arrival. At the time in question, Larendon was fully dressed except for his right foot, which was bare. A subsequent examination revealed that he had been severely beaten; innumerable bruises, old and new, appeared upon different parts of his body, some of which were on his head, ears, lips and beneath his eyes; two of his ribs had been broken; he had a compound fracture of the tibia of the right leg in the vicinity of the ankle, where the flesh had been broken and the bone fractured; this foot was at right angles with the leg; several of his teeth had been fractured; he suffered a subdural and other hemorrhages of the brain; and died on December 7, 1960. There is substantial evidence to support the conclusion that the brain hemorrhages were traumatic in character and were a concurrent cause of death.

The condition of Larendon's bedroom on the morning in question, and his appearance in dress, support the inference that the attack upon him occurred before he retired and that he had been left in a beaten condition for most of the night. He had not removed his clothing; the bed had not been slept in; and the light was burning. A neighbor who lived across the street testified that she had retired between 10 and 10:30 o'clock on the evening in question, and that sometime during the night she heard the dog barking, and then heard a scream.

The defendant's testimony as to the replies made by Larendon when he was asked what happened deserve special consideration. As related by the former, these replies were: "Nothing. My leg will be all right," "I don't know," and "My leg will be all right. Stop worrying." The testimony supports an inference that Larendon was replying to the only matter of concern to the defendant, which was the condition of the leg that the latter had injured.

When the police arrived at the La Jolla residence the defendant was dressed in a robe and slippers; directed their attention to a broken window in the bathroom; stated that he had not opened or closed this window and that he had not gone in or out of it; denied that he knew of or had touched an empty vodka bottle found in a waste basket; said that there never had been a harsh word between himself and Larendon; and wanted the investigation stopped, saying "I wish the old man was dead. He is nothing but a vegetable." The investigation continued and it developed that fingerprints on the window and on the empty vodka bottle were those of the defendant; that a pair of shoes in the defendant's bedroom bore human bloodstains; and that he had three or four cuts on his right hand. In contradiction of any adverse inferences from the foregoing facts, the defendant testified that he had entered through the window in question to gain access to the house the night before; that he had four vodka and Seven-Up drinks before retiring; that some friends who had visited them the earlier part of that evening also had some vodka and Seven-Up drinks; that he received the cuts on his hands while doing some carpentry work in Pennsylvania; and that any contradictory statements made by him were the result of confusion due to emotional stress.

The evidence adequately supports the conclusion of the jury that the defendant murdered John Larendon. However, he claims that it is not sufficient to support the finding of the jury that the murder committed was in the first degree.

■ In opposition to this claim, the People direct our attention to evidence which they contend brings this case within those parts of section 189 of the Penal Code which provides: "All murder which is perpetrated by means of . . . torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate . . . mayhem, . . . is murder of the first degree."

Proof of death by torture within the meaning of the foregoing statutory provision requires the showing of an intent to cause pain and suffering in addition to death. (*People* v. *Tubby*, 34 Cal.2d 72, 77 [207 P.2d 51]; *People* v. *Heslen*, *(Cal.) 163 P.2d 21, 27.) ■ "That intent may be manifested by the nature of the acts and circumstances surrounding the homicide." (*People* v. *Heslen, supra,* *(Cal.) 163 P.2d 21, 27.)

The evidence in the instant case adequately supports the implied finding that the assault occurred over an extended period of time; was brutal; was of that character and that degree that pain and suffering in addition to death must have been intended; was the product of a cruel and sadistic mind; and was the culmination of a pattern of abuse and mistreatment. A vicious aspect of the assault is reflected in an inference based on evidence with respect to the bloodstained shoes. The defendant testified that he put on these shoes when he arose to let his dog go outside because he could not locate his slippers; that he was wearing these shoes when he discovered Larendon covered with blood; that there was a pool of blood on the floor near the latter's broken leg; and that, thereafter, because the shoes were new and hurt his feet, he changed to his slippers. He was wearing slippers at the time the officers arrived. When the shoes were examined, blood droplets were found on the top of the right shoe and bloodstains on the side, arch and sole; bloodstains also were found on the arch and sole of the left shoe. Photographs of the bedroom taken on the morning in question did not show any bloody footprints on the carpet such as might be expected if a person had stepped in a pool of blood and walked about the room. ■ The respondent argues, with merit, that this evidence reasonably supports an inference that the defendant stomped on the victim's leg until it was broken and bleeding, otherwise the blood on his shoes would not have been in the

*A rehearing was granted on November 29, 1945. The final opinion is reported in 27 Cal.2d 520 [165 P.2d 250].

arches or on the side thereof, and the bloodstains on the soles, if made by stepping in a pool of blood, would have been made by a quantity of blood sufficient to mark the carpet as he walked about. The character of the assault; the cruel and pain-provoking means applied to break the victim's leg; the fact that he was left unattended, bleeding and bruised, for several hours; and the defendant's prior threats to harm him coupled with previous mistreatment without cause, satisfactorily establish the intent requisite to a finding of homicide by torture. (*People* v. *Gilliam,* 39 Cal.2d 235, 239 [246 P.2d 31].)

The defendant contends that, in any event, the court erred in instructing the jury with respect to those provisions of section 189 that murder committed in the perpetration of mayhem is murder in the first degree, claiming that the state of the record does not justify the giving of these instructions. Reference is made to section 203 of the Penal Code which provides:

"Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, . . . is guilty of mayhem"; and reliance is placed on the common law rule that proof of this offense requires evidence showing that the disability or disfigurement in question is permanent. (*Vawter* v. *Commonwealth,* 87 Va. 245 [12 S.E. 339] ; *State* v. *Taylor,* 105 W.Va. 298 [142 S.E. 254] ; *State* v. *Johnson,* 58 Ohio St. 417 [51 N.E. 40] ; see also 36 Am.Jur. 3, and 58 A.L.R. 1320.) The defendant claims that the evidence does not show that the assault upon Larendon resulted in permanent disability or disfigurement. On behalf of the People, the attorney general directs attention to the finding of the autopsy surgeon that the victim's right leg, because of the break, was slightly shorter than his left leg and claims that this testimony supports a finding of permanent disability as well as permanent disfigurement. No consideration is given by either side to the questions whether a "slight" shortening of one leg, without any other proof of the degree thereof, is sufficient to establish the required extent of disability or the type of disfigurement contemplated by the statute (see *Murdaugh* v. *Robert Lee Constr. Co.,* 185 S.C. 497 [194 S.E. 447] ; *Lee* v. *Commonwealth,* 135 Va. 572 [115 S.E. 671] ; *State* v. *Nieuhaus,* 217 Mo. 332 [117 S.W. 73] ; 36 Am.Jur. 3), nor whether the evidence, in the light of defendant's previous threats, is sufficient to support a finding of an attempt to perpetrate mayhem within the rule as applied

in *People* v. *Nolan,* 126 Cal.App. 623, 637 [14 P.2d 880], and *People* v. *Vaiz,* 55 Cal.App.2d 714, 718 [131 P.2d 704]. However, it is unnecessary to consider these various facets of the issue presented by the defendant's contention in the premises, because we are convinced, after a review of the entire record including the evidence, that even if error be assumed in giving the instructions objected to, it was not prejudicial error, as the evidence clearly supports the jury's implied finding that the defendant beat and injured Larendon to make him suffer, intentionally tortured him, and that death resulted therefrom. (*People* v. *Gilliam, supra,* 39 Cal.2d 235, 240.)

One of the defense witnesses, Russell Proctor, testified that he never had seen the defendant strike or abuse Mr. Larendon, although he noticed a bruise behind Larendon's ear and there was a slight scar mark on his head upon which the witness placed a "Band-Aid." By way of impeachment, a prosecution witness, Maurice Eastburn, Jr., testified that Proctor had said that on one occasion he saw the defendant beat Larendon with his hands and that the latter's face was covered with blood. In his opening argument the district attorney referred to the testimony of the defense witness; related the impeaching statement; and then said: "I think it is more than reasonable to infer that the reason for these scratches on the head, this Band-Aid, was because of the beating he got between. . . ." At this point defense counsel interjected an objection that the impeaching testimony might not be used as proof that there was any beating of Larendon by the defendant. In response to this objection, the court stated: "Counsel can raise inferences from it. Objection overruled." Thereupon, the district attorney told the jury he believed it was "a reasonable inference that the marks and the bandages that were on the head of Mr. Larendon came as a result of the events described by Russell Proctor in his statement to Maurice Eastburn, Jr." The impeaching statement was admissible only on the issue respecting the credibility of the witness Proctor; was not competent evidence to support the inference referred to by the district attorney; and the order of the court permitting its use for the latter purpose was error. (*People* v. *Orcalles,* 32 Cal.2d 562, 569 [197 P.2d 26].) Nevertheless, a review of the entire record, including the evidence, dictates the conclusion that the error was not prejudicial. (See *People* v. *Granillo,* 140 Cal.App. 707, 717 [36 P.2d 206].) Many witnesses testified directly to numerous

incidents when the defendant had pushed, slapped and struck Larendon; the improper remarks of the district attorney were a minute part of a lengthy argument, consuming four lines of the 35-page transcription of that argument; the jury was admonished by the trial judge in his general charge that the statement of any witness in contradiction of his testimony was received only for the purpose of testing his credibility, might be considered only for that purpose, and was not received for the purpose of proving the truth of what was said; and no other contradictory statements by defense witnesses, other than by the defendant himself, were admitted in evidence.

During the trial the defendant attempted to place in evidence statements made by Larendon while the latter was in the hospital, after the assault in question, that the defendant was not the person who had assaulted him. The offer of proof which accompanied the attempt to introduce this evidence proffered testimony of a nurse that when she asked Larendon if the defendant had hit him, he replied: "No, Bob didn't hit me" and that when she asked who did hit him, he replied: "I don't know, but one of the boys had been in the house before"; other testimony showing that on other occasions in the presence of several persons, including the defendant, his attorney, his investigator, and others, Larendon denied that the defendant had beaten him; and also photographs and motion pictures depicting Larendon and the defendant holding hands at Larendon's bedside. Objections to this evidence were sustained as hearsay, and the defendant contends that the court erred in doing so because the evidence was admissible to prove the state of mind of the victim. No contention is made that the statements were a part of the res gestae or that they constituted dying declarations. In his opening brief, the defendant states that the "offered evidence should have been admitted in order to establish the state of mind of the decedent at the time the assault was made on him." However, at the trial it was indicated that the purpose of the offered testimony was to prove the state of mind of the victim at the time he made the statements in question, as the basis for an inference favorable to the defendant, i.e., that from Larendon's state of mind it might be inferred that the defendant had not assaulted him because a person would not be friendly to someone who had assaulted him.

In *People* v. *Hamilton*, 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473], referring to this type of testimony, the

court said: "Undoubtedly, in a proper case, and in a proper manner, testimony as to the 'state of mind' of the declarant, where there is an issue in the case is admissible, but only when such testimony refers to threats as to future conduct on the part of the accused, where such declarations are shown to have been made under circumstances indicating that they are reasonably trustworthy, and when they show primarily the then state of mind of the declarant and not the state of mind of the accused But there are and should be rigid limitations on the admission of such testimony. One of these limitations is that such testimony is not admissible if it refers solely to alleged past conduct on the part of the accused. This is so because to try and separate state of mind from the truth of the charges is an almost impossible task."

The declarations offered in the instant case referred to past acts of the defendant and were inadmissible under the rule as stated in the opinion just quoted. The fact that the declarations in the case at bar were offered in behalf of the defendant instead of against him is of no consequence in view of the rationale supporting the rule that holds them inadmissible, i.e., "that it is impossible for the jury to separate the state of mind of the declarant from the truth of the facts contained in the declarations." (*People* v. *Hamilton, supra,* 55 Cal.2d 881, 895; see also *Shepard* v. *United States,* 290 U.S. 96, 106 [54 S.Ct. 22, 78 L.Ed. 196]; *People* v. *Talle,* 111 Cal. App.2d 650, 670 [245 P.2d 633].) There is no contention that the subject declarations were admissible as declarations against interest. Any such contention would be without merit. It was decided in an early California case that the statements of a deceased victim of a criminal offense, exculpating a person accused of that offense, are not admissible in a criminal action under an exception to the hearsay rule admitting the declarations of a deceased person against his interest. (*People* v. *McLaughlin,* 44 Cal. 435; see also *People* v. *McCrea,* 32 Cal. 98, 100.) This decision has not been changed or challenged. Exculpatory statements of a deceased victim also have been held inadmissible in *Guy* v. *United States,* 107 F.2d 288 [71 App.D.C. 89] (cert. denied 308 U.S. 618 [60 S.Ct. 296, 84 L.Ed. 516]), *State* v. *Benson,* 346 Mo. 497 [142 S.W.2d 52], *Commonwealth* v. *Bednorciki,* 264 Pa. 124 [107 A. 666], and *State* v. *Labbee,* 134 Wash. 55 [234 P. 1049]). Furthermore, the instant case presents a classic example of the judicially recognized need for scrutinizing the trustworthiness

of the declarations of a deceased person. (*People* v. *Hamilton, supra,* 55 Cal.2d 881, 895; *People* v. *Brust,* 47 Cal.2d 776, 785 [306 P.2d 480].) Much of the testimony related to the defendant's offer of proof, including the photographs and motion pictures, carried a strong showing of the dominating influence which he had exercised over Larendon and, under the circumstances, its trustworthiness was questionable. The refusal to admit the testimony in question was proper.

During the course of the trial, defendant's counsel advised the court that a medical witness, who had conducted a post mortem on the victim, would be unable to attend the trial because of a coronary occlusion, and requested a continuance until the deposition of this witness could be taken. The court denied the motion but cooperated with a suggestion that the People would put on rebuttal witnesses out of order so that the defendant might have an additional day within which to obtain other medical testimony. The latter procedure was followed and the defendant called a pathologist and a neurologist as witnesses who testified in support of his position that the deceased died from natural and not from traumatic causes.

Eight days before trial the defendant had moved for a continuance to permit the medical witness, who later had a heart attack, to prepare himself as a witness for the defense. The affidavits filed in support of this motion show that the medical witness in question intended to perform a post mortem on the deceased; to make a study of his findings and those of the autopsy surgeon, as well as of the hospital medical records submitted to him; and in the course of such study intended to solicit the assistance of the pathologist and the neurologist whom the defendant called as witnesses following his motion for a continuance which was made during the trial. In opposition, the People submitted an affidavit showing that the study in question could be completed in two days. The motion for a continuance was denied. Neither at the time he requested a continuance during the course of the trial, nor at any time thereafter, did the defendant make any showing with respect to the testimony which he expected to elicit from his medical witness, or that the testimony thereafter given by the pathologist and the neurologist did not fully cover the subject matter he intended to present through the witness who was unable to attend. From the discussion between court and counsel at the time the motion for continuance was made, it is apparent that the court concluded that the testimony

which the defendant expected to present was that which could be presented by anyone with experience in the field. In the course of this discussion the court said: "... there is no assurance in the record that this man will ever be available." The attorney for the defendant replied: "I grant you that, your Honor." Thereafter the discussion centered about the time needed to get a witness to replace the man in question. On Tuesday, February 28, 1961, at 3:10 p. m. the court recessed until Wednesday, March 1st, at 10 a. m.; and on the latter date at 10:08 a. m. recessed until Thursday, March 2, 1961, at 10 a. m. Thereupon the pathologist and the neurologist were called as witnesses and testified.

An application for a continuance is addressed to the sound discretion of the trial court and its ruling thereon will not be interfered with on appeal in the absence of a clear showing of abuse of that discretion. (*People* v. *Collins,* 195 Cal. 325, 333 [233 P. 97].) When the reason for a continuance is to obtain the testimony of an absent witness, it is not an abuse of discretion to deny an application therefor in the absence of a showing that the facts to which the absent witness will testify cannot otherwise be proven (*People* v. *Collins, supra,* 195 Cal. 325, 333; *Biedebach* v. *Charles,* 96 Cal.App.2d 250, 252 [215 P.2d 114]); that there is a reasonable probability that if his testimony were produced it would affect the result of the trial (*Young* v. *Evans,* 62 Cal.App.2d 365, 373 [144 P.2d 651]); that such testimony is not merely cumulative (*Crocker-Huffman Land & Water Co.* v. *Goss,* 203 Cal. 233, 237 [263 P. 802]; *People* v. *Fountain,* 170 Cal. 460, 464 [150 P. 341]; *Young* v. *Evans, supra,* 62 Cal.App.2d 365, 373); and that the testimony can be obtained within a reasonable time. (*People* v. *Collins, supra,* 195 Cal. 325, 333.)

Under the circumstances in this case, the refusal to grant the defendant's motion for a continuance was not an abuse of the court's discretion in the premises.

After a review of the entire record, including the evidence, and applying the test approved in *People* v. *Watson,* 46 Cal. 2d 818, 837 [299 P.2d 243], to determine whether error has resulted in a miscarriage of justice, we have concluded that it is not reasonably probable that a result more favorable to the defendant would have been reached if the instructions on mayhem or the remarks of the district attorney to which objection was made had been omitted. Under these circumstances, any error in the giving of these instructions or in

making the objectionable remarks, is not ground for reversal. (Cal. Const., art. VI, sec. 4½.)

The judgment is affirmed.

Griffin, P. J., and Shepard, J., concurred.

A petition for a rehearing was denied April 3, 1962, and appellant's petition for a hearing by the Supreme Court was denied May 9, 1962. Peters, J., was of the opinion that the petition should be granted.